IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 18-cr-664 |
| v. | ) | |
| | ) | Honorable Virginia Kendall |
| MICHAEL THOMPKINS | ) | |
| | ) | |

## DEFENDANT'S REPLY TO GOVERNMENT'S OPPOSITION TO THE MOTION TO SUPPRESS EVIDENCE

MICHAEL THOMPKINS, by the Federal Defender Program and its attorney, AMANDA G. PENABAD, respectfully submits this reply to the government's response to the motion to suppress and asks that the Court enter an order precluding the government from introducing into evidence a pistol seized from Mr. Thompkins' vehicle, and further prohibit the admission of any statements made by Mr. Thompkins following his seizure and arrest on April 29, 2018.

## INTRODUCTION

The government's response fails to carry their burden to prove that the seizure here was reasonable. *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). Their arguments fail for two primary reasons: First, the initial stop was objectively unreasonable given the information known to the officer at the time. Second, the officer extended the traffic stop here without reasonable suspicion. For these reasons, this Court should grant

1

the motion to suppress or order an evidentiary hearing to clarify the material disputes of fact at issue in this case.

## ARGUMENT

**I.     The initial seizure was unreasonable because Mr. Thompkins was not "parked" when Officer Farias decided to execute the traffic stop.**

In defense of the initial traffic stop, the government argues two principal points. First, that Officer Farias had reasonable suspicion of three traffic code violations. And second, that Officer Farias's decision to pull over Mr. Thompkins was based upon a reasonable mistake of fact. An evidentiary hearing will make clear that each of these arguments is misplaced.

   a. <u>Officer Farias knew only of the alleged parking-related violations at the time he pulled over Mr. Thompkins.</u>

The government contends that Officer Farias suspected Mr. Thompkins of violating three separate provisions of the Chicago Municipal Code. (Gov. Opp. Br. at 2.) Consequently, even if two of these three hunches proved unreasonable, the officer's actions were justified. Even just one traffic violation, standing alone, would be enough to support an investigatory stop. (Gov. Opp. Br. at 4-5.) This argument misapprehends the law and the facts for two reasons.

First, there is no evidence that Officer Farias actually executed the stop for any reason other than the two alleged parking-related violations.[1] These two parking-related infractions cannot support the stop because Mr. Thompkins was not parked at all, and any mistake of fact or law to the contrary is unreasonable. The dashcam video appended to Defendant's Motion to Suppress (hereinafter, "Motion") plainly contradicts the officers' account. *See* Dkt. 24 at Exh 2.

Second, Officer Farias only noticed the alleged obstruction-of-view infraction[2] *after* pulling over Mr. Thompkins. Because officers cannot resuscitate an unreasonable stop post-mortem, this infraction cannot save the seizure here.

To be sure, the government notes this violation as a justification for stopping Mr. Thompkins. But the video evidence in this case contradicts the government's claim. According to the police report, Officer Farias allegedly did not see the air freshener until the police vehicle had turned around in the street and positioned itself behind Mr. Thompkins' car. *See* Motion at Exh 1. The testimony and evidence presented at the suppression hearing will show that it was physically impossible for them to have seen any such object until after

---

[1] Municipal City Code § 9-76-090(c) and Municipal City Code § 9-40-200(c).
[2] Municipal City Code § 9-40-250(b).

they conducted the traffic stop in question, and had therefore already seized Mr. Thompkins.

Indeed, the footage shows that once pulled over, Officer Farias focuses only on the alleged parking violation, asking why Mr. Thompkins moved to his current parking spot. *See* Motion, Exh 3 at 1:06. The officer makes no mention of any obstruction-of-view issues. Officer Farias first observes the obstruction-of-view issue much later, only when pressed by Mr. Thompkins as to why he is extending the traffic stop. *Id.* at 6:08.

Standing alone, this delayed verbal observation might not be dispositive of Officer Farias's initial reasons for stopping Mr. Thompkins. But there are other contextual considerations present here. Combined, the totality of the circumstances render the government's timeline implausible at best.

The first important piece of context is that the object "obstructing" Mr. Thompkins's view was allegedly an air freshener. The arrest report in this matter states that the officers saw "a large swinging object hanging from the rear-view mirror..." Motion, Exh. 1 at 3. If this report is correct, and Officer Farias did pull over Mr. Thompkins on this basis, there might be a technical basis for the traffic stop.

But video evidence contradicts this report's account. In the body-worn camera footage, Officer Farias specifically points at a cell phone mounting device when Mr. Thompkins asks him why the officer is extending the traffic

stop. Motion, Exh 3 at 6:02. Officer Farias replies: "Obstruction of view right there." Mr. Thompkins then confirms that the officer is referencing the cell-phone device by physically touching the item and asking: "What, this?" *Id.* at 6:08. Officer Farias confirms the object he is referencing is the phone mount, saying "yeah." Mr. Thompkins replies that "this is for my uber," further confirming that the two are discussing the cell phone mount and not any alleged air freshener. Only in his report, well after the ultimate arrest, did Officer Farias cite the "large swinging object" as a basis for the initial traffic stop. *See* Motion, Exh. 1. It strains credulity to suggest that Officer Farias executed the traffic stop here based any obstruction of view issue.

The second relevant contextual consideration here is that Officer Farias executed this stop near midnight. *See id*. Both common sense and the available footage indicate that the scene of the stop was not well-lit. *See* Motion, Exh 2. Officer Farias claims to have seen the object while the police vehicle was executing its U-turn to maneuver behind Mr. Thompkins, *see* Motion, Exh 1, meaning the officer would have had to see through the back window of Mr. Thompkins' car clear to the front rearview mirror. The dashcam footage shows both that the officers' vehicle was at a distance from Mr. Thompkins, making any such observation impossible, and that the lighting precluded such an observation. *Id*.

### b. Any mistake of fact here was objectively unreasonable.

The government claims that even if Mr. Thompkins was not actually parked when Officer Farias pulled him over, Officer Farias's belief to the contrary was a reasonable mistake of fact. The Seventh Circuit has held that stops executed based on officers' reasonable mistakes of fact do not violate the Fourth Amendment. *United States v. McDonald*, 453 F.3d 958, 962 (2006). So if Officer Farias was reasonably mistaken, then the stop did not violate the Constitution.

First, the video evidence contradicts the government's assertion that the officers mistakenly believed Mr. Thompkins' vehicle to be parked. As the dashcam video shows, the officers' vehicle (travelling against traffic) slows to a halt while Mr. Thompkins car proceeds down the middle of the street towards the officers, and only begins to drive forward again once Mr. Thompkins' car begins to move out of the way to let them pass. *See* Motion, Exh 2 at 0:08 - 0:14. There is no question, based on the video, that the officers saw Mr. Thompkins' car move over to let them through.

Admittedly, it is possible that Officer Farias failed to recognize that Mr. Thompkins pulled over because the police cruiser was driving directly into oncoming traffic. But any such failure was unreasonable. This is clear because Officer Farias himself induced the action he purportedly mistook as parking. Officer Farias was driving the wrong way down a one-way street, on a collision

course with Mr. Thompkins, who was driving in the correct direction. Recognizing that Officer Farias was directly in his path, Mr. Thompkins pulled to the side to allow the officer to safely pass him. A stop executed based on an unreasonable mistake of fact like this does not satisfy the strictures of the Constitution. For this reason, Officer Farias's traffic stop violated the Fourth Amendment.

II. **Officer Farias detained Mr. Thompkins without reasonable suspicion after completing the traffic-related mission of the initial stop.**

Even if Officer Farias had legitimate reasons to execute the initial traffic stop, those reasons evaporated once he completed his traffic-related mission. Those reasons could not support the extended traffic stop here for two reasons: First, because the Supreme Court in *Rodriguez* rejected any *de minimis* or "mere seconds" exception to the Fourth Amendment. And second, because Officer Farias lacked independent reasonable suspicion to continue to detain Mr. Thompkins.

a. *Mimms* does not authorize a "mere seconds" exception to *Rodriguez*'s prohibition against extended traffic stops.

The government contends that Officer Farias could order Mr. Thompkins out of the car because that order would have only "prolonged the lawful stop by mere seconds." Gov. Opp. Br. at 9-10. In the government's view, this

prolongation was justified because of the officer-safety interests inherent in every traffic stop. Gov. Opp. Br. at 8.

These contentions misstate the clear mandate in *Rodriguez v. United States*, 135 S. Ct. 1609 (2015). In that case, the Court expressly overruled an Eighth Circuit rule allowing "*de minimis*" extensions of ordinary traffic stops. *Id.* at 1614. Absent independent reasonable suspicion, the Fourth Amendment forbids any prolongation of a stop beyond the time reasonably necessary to complete the stop's traffic-related mission. *Id.* at 1613 ("We hold that a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures."). Whether such an extension is "mere seconds" or any other length of time is irrelevant.

The government seems to argue that the extension here was justified under *Pennsylvania v. Mimms*, 434 U.S. 106 (1977). Gov. Opp. Br. at 7-8. To be sure, it is true that *Mimms* allows officers to request drivers to step out of their cars in most circumstances. But *Mimms* only allows such a request in the course of a detention already justified by reasonable suspicion. Here, Officer Farias only requested that Mr. Thompkins exit the vehicle *after* completing the traffic stop. In this context, the order to exit the vehicle violated the Fourth Amendment because the order prolonged the already-completed traffic stop.

We know this order was unlawful because the *Rodriguez* Court was presented with similar facts. There, an officer ordered Mr. Rodriguez to exit the vehicle after attending to the traffic-related concerns of the stop. *Rodriguez*, 135 S. Ct. at 1613 ("[The officer] instructed Rodriguez to turn off the ignition, exit the vehicle, and stand in front of the patrol car . . . ."). It is true that the officer would have had every right to order Mr. Rodriguez out of the car *during* the traffic stop. But that is not what the officer did.

Just so here. Like Mr. Rodriguez, Mr. Thompkins was ordered out of his vehicle *after* the traffic stop should have ended. And like in *Rodriguez*, we have evidence from the officer's own mouth conceding that the traffic-related concerns were over. *Compare Rodriguez*, 135 S. Ct. at 1613 (noting that the officer testified he had "got all the reason[s] for the stop out of the way") *with* Farias Body Camera, attached as Exh. 3 at 5:24 ("I'm not going to give you tickets or anything like that.").

The government additionally cites *United States v. Rushin*, No. 16 CR 288, 2017 WL 4944820, at *3 (N.D. Il. Nov. 1, 2017) to support the view that the Constitution permits "steps taken in furtherance of officer safety that minimally prolong an otherwise lawful seizure." Gov. Opp. Br. at 8. Standing alone, that observation might seem to cut against Mr. Thompkins.

But, when read in the proper context, *Rushin* fails to support the government's position. The *Rushin* court was presented with facts distinct

9

from those in this case. There, the officer who executed the initial traffic stop called a K-9 unit to sniff Rushin's car *while the traffic-related mission was ongoing*. Specifically, the officer "asked Rushin to step out of the [car] so he could explain the [traffic] warning to Rushin and obtain Rushin's signature." *Id.* Such a request is permissible under *Rodriguez* because the officer was in the process of issuing a formal traffic citation, which required Mr. Rushin's signature.

That is not what happened here. We know this because Officer Farias himself told Mr. Thompkins that he was "not going to give [Mr. Thompkins] tickets or anything like that." *See* Farias Body Camera, attached as Exh. 3 at 5:24. At that point, the traffic-related mission of the stop was over. Consequently, Officer Farias needed independent reasonable suspicion of a separate crime to continue to detain Mr. Thompkins. *See Rodriguez*, 135 S. Ct. at 1615 ("An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual."). To hold otherwise based on some sort of "mere seconds" exception would revive the *de minimis* rule squarely rejected by the Supreme Court in *Rodriguez*.

> b. The government has not met its burden to prove that the extension of the stop here was supported by reasonable, articulable, and particularized suspicion of a crime.

For this reason, the government must prove that Officer Farias had independent reasonable suspicion of a crime in order to extend the stop. *United States v. Basinski*, 226 F.3d 829, 833 (7th Cir. 2000) (noting that the government bears the burden of proving the legality of a warrantless seizure). To meet the reasonable suspicion requirement, an officer must have "a particularized and objective basis" for suspecting the persons detained of breaking the law. *Heien v. North Carolina*, ⎯⎯ U.S. ⎯⎯, 135 S.Ct. 530, 536, 190 L.Ed.2d 475 (2014). The factors cited in the government's response fail to carry this burden.

The first factor cited by the government is Mr. Thompkins's criminal record. Gov. Opp. Br. at 10. But federal courts across the country have held that an individual's prior convictions, standing alone, can never create reasonable suspicion. *See, e.g., United States v. Davis,* 94 F.3d 1465, 1469 (10th Cir. 1996) (finding that "a prior criminal record is not, standing alone, sufficient to create reasonable suspicion."); *United States v. Fields*, 458 F.2d 1194, 1198 (3d Cir. 1972); *United States v. Monteiro*, 447 F.3d 39, 47 (1st Cir. 2006) (stating that knowledge of an "individual's criminal history" cannot substitute for "objective indications of ongoing criminality"); *United States v. Sprinkle*, 106 F.3d 613, 617-18 (4th Cir. 1997) (finding that a suspect's prior

crimes cannot create reasonable suspicion, even coupled with presence in a high-crime area); and *United States v. Castle*, 825 F.3d 625, 636 (D.C. Cir. 2016) (observing that "officers' prior experience with" the defendant and his presence in a high-crime neighborhood could not provide the "necessary, concrete indicia" that the defendant was engaged in wrongdoing).

The second factor cited by the government is the presence of a "police baton"[3] in Mr. Thompkins's car. Gov. Opp. Br. at 10. The government contends that this object, coupled with Mr. Thompkins's past convictions, gave Officer Farias reasonable suspicion of ongoing criminal wrongdoing.

But the government has provided no evidence that the "police baton" here was itself illegal to possess. And the government has likewise failed to introduce any evidence connecting the possession of such an object to crime in any way. Without anything tending to establish a connection of this kind, the "police baton" here cannot give rise to the "necessary, concrete indicia" that Mr. Thompkins was engaged in wrongdoing. *Castle*, 825 F.3d at 636.

Even assuming for the sake of argument that the object was somehow probative of wrongdoing, there is nothing to suggest it was probative of the specific wrongdoing suspected here. The government asks this Court to conclude, without any kind of evidentiary hearing, that the presence of a baton

---

[3] It bears noting that no party, including Officer Farias, has ever referred to the object in Mr. Thompkins's car as a "police" baton. The inventory report produced describes the object as a "black wood baton."

is somehow associated with illegal firearm possession. The Fourth Amendment demands more than bare assertions of this kind.

Finally, Officer Farias makes clear his supposed basis for asking Mr. Thompkins to step out of the car, and it does not include mention of the alleged baton. The officer first tells Mr. Thompkins that he wants him to exit the car because he "want[s] to make sure you don't have any guns in the car." Motion, Exh 3 at 5:27. When Mr. Thompkins asks why he should permit the officers to search his car, *id.* at 5:32, Officer Farias responds that "based on your history of weapon usage, I need you to step out." *Id.* at 5:42. The officer never mentions the baton or even acknowledges his partner's observation that a baton-like object is in the car.

The government has failed to carry its burden to establish reasonable suspicion to support the extension of the stop. The stop therefore runs afoul of the Supreme Court's directive in *Rodriguez*, and the fruits of this illegal stop should be suppressed.

## CONCLUSION

For these reasons, we request that this Court either GRANT the motion to suppress or conduct an evidentiary hearing to resolve the contested factual issues in this case.

    Respectfully submitted,

    FEDERAL DEFENDER PROGRAM
    John F. Murphy
    Executive Director

By:   s/ *Amanda G. Penabad*
      Amanda G. Penabad

AMANDA G. PENABAD
FEDERAL DEFENDER PROGRAM
55 E. Monroe Street, Suite 2800
Chicago, Illinois 60603
(312) 621-8340

*Written with the assistance of Theodore J. Torres*
*Arthur Liman Public Interest Fellow*

# CERTIFICATE OF SERVICE

The undersigned, <u>Amanda G. Penabad,</u> an attorney with the Federal Defender Program hereby certifies that in accordance with FED.R.CIV.P5, LR5.5, and the General Order on Electronic Case Filing (ECF), the following document:

**DEFENDANT'S REPLY TO GOVERNMENT'S OPPOSITION TO THE MOTION TO SUPPRESS EVIDENCE**

was served pursuant to the district court's ECF system as to ECF filings, if any, and were sent by first-class mail/hand delivery on <u>February 4, 2019</u>, to counsel/parties that are non-ECF filers:

By: <u>s/ *Amanda G. Penabad*</u>
Amanda G. Penabad
FEDERAL DEFENDER PROGRAM
55 E. Monroe St., Suite 2800
Chicago, Illinois 60603
(312) 621-8340