IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 18-cr-664 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| MICHAEL THOMPKINS | ) | |

## MICHAEL THOMPKINS'S POST-HEARING MEMORANDUM IN SUPPORT OF THE MOTION TO SUPPRESS

MICHAEL THOMPKINS, by the Federal Defender Program and its attorney, AMANDA G. PENABAD, respectfully submits this post-hearing memorandum in support of his motion to suppress. Mr. Thompkins asks that the Court enter an order precluding the government from introducing into evidence a pistol seized from Mr. Thompkins's vehicle, and further prohibit the admission of any statements made by Mr. Thompkins following his seizure and arrest on April 29, 2018.

## INTRODUCTION

On March 8 and March 15, 2019, this Court heard testimony from two police officers regarding the warrantless seizure of a firearm from Mr. Thompkins's vehicle. That testimony established that the officers in this case violated the Fourth Amendment in two ways: First, the officers initiated a traffic stop of Mr. Thompkins even though Mr. Thompkins violated no traffic laws. And second, the officers continued to detain Mr. Thompkins after disposing of the traffic-related reasons for the stop without the reasonable, articulable, and particularized suspicion necessary

to do so. For these reasons, this Court should grant Mr. Thompkins's motion to suppress.

## STATEMENT OF FACTS

Just after 9:00pm on April 29, 2018, Chicago Police Officers Roger Farias and Sam Broderick were patrolling the 6100 block of South May Street. Tr. at 29-30.[1] That section of May Street is a one-way street, running north to south. Tr. at 32. But Farias and Broderick were driving the wrong way on May Street, in the direction of oncoming traffic. Tr. at 33. They were in a marked police SUV with the headlights turned on. Tr. at 51, 61. Soon after turning onto South May, the officers flashed the SUV's spotlight. Tr. at 62.

At that point, there were no other vehicles on South May between the officers and Mr. Thompkins. Tr. at 61. The officers continued to drive in his direction, toward the intersection of South May and 61st Street. Tr. at 63. As can be seen in the available dash-cam footage, this section of South May is narrow. The rows of cars parked on either side of the street leave room for one lane of one-way traffic. Tr. at 64; Gov. Exh. 1 at 00:00-00:28.[2] Recognizing as much, Mr. Thompkins pulled over to allow the officers' vehicle to pass. Tr. at 63-64.

Their pathway cleared, the officers passed Mr. Thompkins without incident. But instead of continuing up South May, Farias turned the car around. Tr. at 36. At

---

[1] "Tr." is used throughout this memorandum to refer the transcript (and page number) of Mr. Thompkins's suppression hearing, which took place on March 8 and 15, 2019.

[2] Gov. Exh. 1 refers to the dash cam video labeled Government Exhibit 1 and entered into evidence at the suppression hearing.

the hearing, Farias claimed to witness Mr. Thompkins pull from the side of the street and attempt to maneuver his car into a different spot. *Id.* Farias then positioned the police SUV behind Mr. Thompkins's car and initiated a traffic stop. *Id.* At this point, Farias testified that it appeared as though Mr. Thompkins "had his car in reverse." *Id.*

Next, Farias exited his cruiser and approached Mr. Thompkins's vehicle. Tr. at 37. As he approached, Farias shined his department-issued flashlight in the windows of the car, hoping to find weapons or contraband. *Id.* But the flashlight revealed nothing, so Farias began to speak with Mr. Thompkins at the driver's side window. Tr. at 38. At this point in the body-worn camera footage, Mr. Thompkins already held a lit cigarette in his hand. Gov. Exh. 2 at 00:20-00:25.[3]

Farias first requested Mr. Thompkins's driver's license and proof of insurance. Mr. Thompkins handed both documents to Farias, who then asked if Mr. Thompkins had "anything in the car [he] should know about[,]" such as "guns" or "drugs[.]" Gov. Exh. 2 at 00:25-00:50. Mr. Thompkins denied possessing contraband, and Farias walked back to the police SUV to inspect the license and insurance card, once again shining his flashlight inside the vehicle as he walked. Before returning to the police SUV, Farias instructed Mr. Thompkins to "put his vehicle in park." Tr. at 40. Farias "kn[e]w his vehicle was not parked" because he "observed the shifter in the reverse position." Tr. at 41.

---

[3] Gov. Exh. 2 refers to the video from Farias's body-worn camera labeled Government Exhibit 2 and entered into evidence at the suppression hearing.

Once back inside the police SUV, Farias began to check Mr. Thompkins's driver's license and proof of insurance. *Id.* Neither of these checks revealed any problems with Mr. Thompkins's ability to legally drive. Tr. at 71. Farias also checked to see if Mr. Thompkins had any outstanding warrants. That check likewise failed to reveal any issues. *Id.*

But rather than return to Mr. Thompkins to attend to the traffic stop, Farias decided to conduct a criminal history check. Tr. at 42. He conducted this check using the CLEAR database. *Id.* This check revealed that Mr. Thompkins had prior criminal convictions for firearm possession. *Id.*

Next, Farias returned to Mr. Thompkins. He told Mr. Thompkins that he was "not going to give [Mr. Thompkins] tickets or anything like that." **Gov. Exh. 2 at 5:24;** see also Tr. at 73. But even so, Farias continued to detain Mr. Thompkins, stating that he "just want[ed] to make sure [Mr. Thompkins] d[idn't] have any guns in the car." *Id.* Mr. Thompkins then made clear that he refused to consent to any search of his vehicle. Farias responded by stating that he needed Mr. Thompkins to "step out" of the car based on his criminal record. Gov. Exh. 2 at 5:42. During this exchange, Broderick noticed an object he thought to be a baton inside Mr. Thompkins's car. Gov. Exh. 2 at 5:06-5:21; Tr. at 76.

Mr. Thompkins requested that a police lieutenant come to the scene before he exited the vehicle. Consequently, Farias called his supervisor, Sergeant Brown, to the scene of the stop. Tr. at 48. Sergeant Brown arrived a few minutes later and began to speak to Mr. Thompkins. Eventually, officers on the scene forced Mr.

4

Thompkins out and discovered a pistol inside the car. Tr. at 49-50. Mr. Thompkins was arrested and charged in Cook County with resisting arrest, three traffic offenses, and with possessing the firearm despite his prior felony conviction. A little over five months later, a federal grand jury indicted Mr. Thompkins under 18 U.S.C. § 922(g). Dkt. #1.

## ARGUMENT

### I.     Officer Farias Is Not A Credible Witness

Before turning to the legal analysis, it is necessary to address the credibility of the officers in this case. The government's case turns on the credibility of the officers' testimony. Without credible witnesses, the prosecution cannot shoulder its burden of proving that this warrantless seizure was within constitutional bounds.

The government cannot meet this burden in this case because its version of events is entirely dependent upon testimony and other evidence from Farias, a demonstrably unreliable source. The officers' version(s) of events materially differ from report-to-report, and changed yet again when they testified before this Court at Mr. Thompkins's suppression hearing. That testimony included what is now known to be a lie: Farias testified that his actions leading up to Mr. Thompkins's seizure were motivated by a purported ShotSpotter alert that never happened. His testimony on this point was detailed and specific, and it was untrue. The Court also knows that this is not the first time Farias has offered an incredible, latter-day version of events to justify his actions. On the contrary, Farias was disciplined, based in part on his lack of credibility, for a bad stop he conducted just three

months before the arrest in this case, in the same neighborhood. Finally, the officers' accounts of the circumstances of Mr. Thompkins's stop vary widely and irreconcilably. These factors should lead this Court to conclude that Mr. Thompkins's suppression motion should be granted.

> a. A Law Enforcement Disciplinary Authority Found That Farias Invented Post-Hoc Rationalizations for Unlawful Searches and Seizures

Determining whether a witness has been untruthful can, under some circumstances, be very difficult. Minor discrepancies in witness accounts can flow from willful dishonesty or innocent forgetfulness. The task here, however, is made far less difficult because this Court has a contemporaneous finding from an adjudicative body to assist its consideration of Farias's credibility. Farias, whose testimony is essential to the government's version of events, was found to lack credibility less than three months after Mr. Thompkins's arrest in this case.

That adjudicative body was the Civilian Office of Police Accountability ("COPA"). In 2018, a civilian accused Farias of stopping him without reasonable suspicion, unreasonably detaining him following the stop, and using excessive force, among other allegations. COPA Report, attached as Exh. 1, at 1. COPA conducted a thorough review of the underlying facts to determine what exactly happened. In that review, COPA watched video of the incident, interviewed the officers involved, and read the relevant police reports. *Id.* at 1, 9. COPA ultimately concluded that Farias detained the complainant without justification, continued that detention for an excessive period of time, and used force without justification. *Id.* at 12.

6

COPA decided against Farias because his account was simply not credible. Specifically, the investigators found it "problematic" that Farias first articulated reasons to justify the stop during his interview with COPA—reasons that never appeared in his contemporaneous reports or on the video obtained from his and another officer's body-worn cameras. *Id.*at 10. Instead, Farias and his then-partner came up with post-hoc justifications of their initial stop when they were later interviewed.

This case presents near-identical circumstances. Upon taking the stand, Farias testified to several key details regarding the stop of Mr. Thompkins which are wholly absent from any of the written reports or body-worn camera footage. These kinds of post-hoc justifications did not persuade COPA's investigators, and they should not persuade the Court in this case.

This Court can consider specific instances of past dishonesty if they are probative of the character for truthfulness or untruthfulness of the witness. Fed. R. Evid. 608(b)(1). And the specific dishonesty here is especially probative. Farias omitted key details concerning the initial stop and subsequent extended detention of a civilian while he was patrolling the Seventh District. Moreover, Farias executed the stop in question just over three months prior to the stop of Mr. Thompkins, and was interviewed by COPA while the prosecution of Mr. Thompkins was ongoing. Exh. 1 at 4. In light of both the factual similarities and temporal proximity to Mr. Thompkins's case, this Court should afford the COPA Report the weight it deserves.

b.  <u>The Nonexistent ShotSpotter Alert</u>

One of Farias's post-hoc rationalizations for the seizure here was a purported ShotSpotter alert that he claimed to hear just before the stop of Mr. Thompkins. The first time Farias mentioned this purported alert was four days before the suppression hearing, when he was meeting with the government to prepare to testify, nearly one year after the stop. There is no mention of a ShotSpotter alert in any reports from the night of Mr. Thompkins's arrest. The reason for this is simple: the alert Farias described under oath before this Court never happened. This reason, standing alone, should lead this Court to conclude that it cannot rely on Farias as it considers the evidence related to Mr. Thompkins's motion.

Specifically, Farias testified that he was patrolling in the area of a ShotSpotter alert that had just gone out over dispatch. Tr. at 33. In pursuing that alert, he reported that Broderick noticed something suspicious in an empty lot on South May Street. *Id*. According to Farias, that was the reason he drove the wrong way up a one-way. *Id*. He initially described that alert as having gone out "a little bit" prior to the stop of Mr. Thompkins. Tr. at 43. Later, he clarified that alert went out "somewhere around" five minutes before he stopped Mr. Thompkins. Tr. at 52. Farias testified that the alert had detected gunshots around "two blocks away" from the scene of Mr. Thompkins's stop. Farias explained that he and Broderick were driving the wrong way up South May Street because they were *en* route to the scene of the alert. None of this testimony is true. As with the COPA investigation, Farias is fabricating a narrative to provide cover for his conduct.

8

At the time of his testimony, Farias's account of the ShotSpotter alert was already dubious. Like the purported drug transaction in the COPA Report, Farias failed to mention the alert in any of the numerous written reports in this case. *See* Tr. at 56-7. The body-worn camera footage is similarly silent regarding any ShotSpotter alerts. And additional footage revealed that Officers Farias and Broderick were driving the wrong way up a one-way approximately 20 minutes prior to the stop of Mr. Thompkins, and 15 minutes before the time of the purported ShotSpotter alert.[4] *See* Tr. at 82, 128-130.

Broderick, on the other hand, never once mentioned a ShotSpotter report. When asked why he and Farias drove northbound on South May Street, Broderick offered that they were "[j]ust patrolling." Tr. at 107. When pressed on this point, Broderick speculated that they might have been looking for city-sticker violations. Tr. at 126. He could not recall any "special reason" for driving the wrong way. *Id.* Broderick further clarified that the choice to drive up South May was Farias's, not his. Tr. at 127.

---

[4] During the evidentiary hearing, the defense played portions of a video documenting a traffic stop that occurred approximately 20 minutes before Mr. Thompkins was stopped. Tr. at 93:4-18; Exh. 2 (a copy of this video will be produced to the Court with the courtesy copy of this filing). During that video a "shots fired" call is broadcast by dispatch. Exh. 2 at 7:38. The call is for one shot in an alley at 5348 S. Sayre, an address in the 8th District over 8 miles from the site of Mr. Thompkins's arrest. Furthermore, immediately following the call, dispatch orders officers to "disregard" the call and announces that it involved fireworks ("disregard—it's fireworks, disregard;"*Id.* at 7:59). It goes without saying that this call cannot be the purported ShotSpotter call that Farias referred to in his testimony.

All these details stand in stark contrast to Farias's testimony. He told the Court that the entire reason they turned onto South May to begin with was because Broderick noticed something in an empty lot that could have related to the ShotSpotter alert. Tr. at 32-33. In Farias's telling, Broderick told him to turn on South May to investigate this empty lot, and that investigation was related to a specific event that never happened (the ShotSpotter alert). Tr. at 60.

In light of this conflicting testimony, the defense subpoenaed ShotSpotter records identifying shots fired incidents within the Seventh District on April 29, 2018, between the hours of 2:00 p.m. and 10:30 p.m., the hours Farias worked that day. Exh. 3. The results make this much clear: there was no ShotSpotter alert from that night that could possibly match the one Farias described. *Id.* at 3-4. The alert closest to the stop of Mr. Thompkins occurred at 6:47pm on 6004 South Bishop Street. Exh. 4 at 4. This alert was two and a half hours before the stop, and approximately eight blocks away.

Consequently, Farias's sworn testimony that there was an alert five minutes prior and two blocks away from Mr. Thompkins's stop is simply not credible. Farias did not qualify his testimony—he swore to a specific memory of an event that, in his mind, provided cover for his questionable tactics. Here, as in the COPA investigation, Farias has added latter-day details to whitewash the record. As a result, this Court can and should view the rest of his testimony with a skeptical eye.

c. Inconsistencies Between the Police Reports, Body-Worn Cameras, Federal Law Enforcement Interviews, and Sworn Testimony

Finally, the myriad inconsistencies between the officers' reports, camera footage, interview statements, and sworn testimony cannot be ignored. Certain pieces of testimony flatly contradict the evidence collected at the time of the stop. Other pieces were conspicuously absent from any contemporaneous recordings, and first arose at the evidentiary hearing, almost one year after the relevant events. Both species of inconsistency cast doubt on the officers' latter-day explanations for their conduct.

i. *Mr. Thompkins's Alleged Nervousness*

When testifying, Farias stated for the first time that he thought Mr. Thompkins was nervous. Tr. at 68. He said Mr. Thompkins was acting "weird." Tr. at 69. He believed that Mr. Thompkins's lit cigarette was a sign of nervousness. Tr. at 40. Farias attempted to explain that Mr. Thompkins was seated too close to the steering wheel of his car, and that his hands were shaking. Tr. at 99. All of these details are absent from the police reports in this case.[5]

These latter-day details are contradicted by the words of both officers. When asked during the hearing whether he "notice[d] anything about the defendant's behavior" during the stop, Broderick replied that he had not. Tr. at 111. And more

---

[5] When asked to explain why these details were omitted, Farias asserted that Broderick wrote the reports, not him. But the arrest report itself lists Farias as the "attesting officer." Tr. at 53-54. And in any case, Farias conceded that he tried to "proofread it and add information on there." Tr. at 54.

tellingly, Farias can be overheard on his own body-worn camera telling a colleague that Mr. Thompkins "wasn't acting weird yet." Tr. at 71, Gov. Exh. 2 at 24:10.

The footage of the stop itself backs up that on-the-scene observation. When Farias approached him, Mr. Thompkins promptly pointed out where his license and insurance were, and handed them over when asked. *Id.* at 00:30. Then, in response to a question from Farias, Mr. Thompkins explained that he pulled to the side to let the officers pass, and then attempted to park. *Id.* at 1:05-1:25. At no point did Mr. Thompkins's hands shake. Nor did he visibly sweat. And while Mr. Thompkins did smoke a cigarette during the stop, he did not "start[] smoking" when Farias began questioning. Tr. at 40. Rather, his cigarette was lit well before Farias approached the car. Gov. Exh. 2 at 00:20-00:32. Nothing in the video would lead a reasonable officer to think that Mr. Thompkins behaved unusually nervously compared to the average motorist.

### ii. The Decision to Issue Traffic Tickets

At the hearing, Farias contended that he had not actually decided whether to issue traffic tickets when he told Mr. Thompkins he would not be ticketed. That self-serving contention should not be credited.

At the scene, Farias told Mr. Thompkins that he was "not going to give [him] tickets or anything like that." Gov. Exh. 2 at 5:24; Tr. at 73. The government now characterizes this promise as some sort of bizarre de-escalation tactic. Tr. at 167. However little sense that characterization makes on its own terms, it makes even less sense when considering Farias's various inconsistent stories.

12

On direct, Farias insisted that he needed to consult with Broderick before making his final ticketing decision. To not consult would be "unfair" to his teammate. Tr. at 28. But later, Farias shifted this narrative, stating instead that "at that point, [he] didn't want to write any tickets[.]" Tr. at 73. He ultimately attempted to reconcile these positions by claiming he "could always change [his] mind." *Id.*

Farias's "unfairness" explanation is untrue; Broderick told the Court as much. Broderick stated that he "defer[s]" to the driving officer's decision to issue tickets or not. Tr. at 103-04. He further testified that he was "following [Farias's] lead" that night. Tr. at 124. And if that were not enough, footage of an earlier traffic stop under nearly identical circumstances from that same night shows Farias making a unilateral decision not to issue traffic tickets to a man parked with his headlights on. Tr. at 92, 128-130.

### iii. Observation of the Alleged Traffic Offenses

Finally, the officers told several stories about what they saw the moment Farias decided to stop Mr. Thompkins. At the hearing, Farias testified that he observed items obstructing Mr. Thompkins's view as they drove northbound past Mr. Thompkins's car. Tr. at 64. Standing alone, this contention is dubious. Farias claimed to see the object at this point, but Broderick testified that driving counter to the flow of traffic obstructed their view into the car's cabin. He stated that he and Farias could not make out Mr. Thompkins very well as they passed him because the flash of Mr. Thompkins's headlights was "blocking [their] vision." Tr. at 134. It

stands to reason that they would have similar difficulty discerning objects a fraction of Mr. Thompkins's size.

And in his arrest report, Farias wrote that he noticed the items only after he had turned his squad car around to execute the traffic stop. Tr. at 64-5. In that same vein, the original case incident report indicates that the officers observed the objects once they had pulled in behind Mr. Thompkins's car to stop him. Tr. at 65.

The nature of those obstructing items changed over time as well. In the body-worn camera footage, Farias indicated that the stationary GPS mount in Mr. Thompkins's car was the offending object. Tr. at 79-80, Gov. Exh. 2 at 6:05-6:15. And later in the footage, he told Broderick that the cracked side mirror was the basis for his stop. Tr. at 78. It later became clear to Farias that the cracked side mirror did not actually violate any law, so he declined to cite Mr. Thompkins for it in the reports he authored. *Id.* Instead, Farias wrote in his arrest report that he stopped Mr. Thompkins because he had an object "swinging" in his windshield. Tr. at 80.[6] And finally, Farias testified on direct that he saw unspecified "objects in the mirror." Tr. at 36.

In sum, three strands of dishonesty loom over Farias's version of events. Each of the three, standing alone, casts serious doubt on Farias's credibility. The combination of all three, however, provides overwhelming support for Mr. Thompkins's motion and makes it impossible to conclude that Farias has been truthful about the events of April 29, 2018. First, Farias has been disciplined for

---

[6] Neither a GPS mount nor a cracked mirror "swing" in the windshield.

14

fashioning post-hoc justifications for Fourth Amendment violations in the recent past. Second, he engaged in identical conduct in this case when he claimed to be investigating a ShotSpotter alert that never happened. And third, the officers' accounts of what transpired that night conflict in numerous, material ways. As a result, this Court should not credit the officers' versions of events. Without credible testimony, the government cannot carry its burden in this case. *United States v. Garcia-Garcia*, 633 F.3d 608, 612 (7th Cir. 2011) ("The prosecution bears the burden of proving by a preponderance of the evidence that a warrantless stop is supported by probable cause."). Accordingly, this Court should grant Mr. Thompkins's motion to suppress.

## II. The Stop Violated the Fourth Amendment at the Outset Because the Officers Did Not Witness Any Traffic Violations

In defense of the initial traffic stop, the government argues two points. First, that Farias had reasonable suspicion of three traffic code violations. Tr. at 142. And second, that Farias's decision to pull over Mr. Thompkins was based on a reasonable mistake of fact. Gov. Opp. Br. at 2. The evidentiary hearing established that neither of these points holds water.

Rather, the officers here executed the stop based on two parking violations, even though Mr. Thompkins was never parked. If they truly believed that Mr. Thompkins was parked, such a belief was unreasonable. Moreover, the officers' after-the-fact assertions that the stop was based on an obstruction-of-view infraction are not credible. This seizure thus violated the Fourth Amendment. Consequently, all evidence flowing from the stop must be suppressed.

15

a.  Legal Standard

The Fourth Amendment protects people "against unreasonable searches and seizures." U.S. Const. Amend. IV. To justify a warrantless investigatory stop, the government must prove that the investigating officer possessed a reasonable, articulable, and particularized suspicion that the suspect committed a crime. *See Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000). There must be "objective justification" for such a stop. *Id.* at 119.

Courts determine whether an officer had an objective justification by looking to what facts the officer actually knew at the time of the stop. *See United States v. Wilbourn*, 799 F.3d 900, 908-09 (7th Cir. 2015) (finding that officers lacked justification for a traffic stop because they were not in fact aware of available facts which gave rise to reasonable suspicion of a crime). Courts "focus not on whether a reasonable officer 'would' have stopped the suspect (even though he had probable cause to believe that a traffic violation had occurred)[.]" *United States v. Hughes*, 606 F.3d 311, 316 (6th Cir. 2010). Nor do they look to "whether any officer 'could' have stopped the suspect (because a traffic violation had in fact occurred)[.]" *Id.* Rather, courts must determine "whether this particular officer in fact had probable cause to believe that a traffic offense had occurred[.]" *Id.* These determinations are "fact-dependent and will turn on what the officer knew *at the time he made the stop*." *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) (en banc) (emphasis in original).

**b.** <u>Farias Executed the Stop Based on Actions That Were Clearly Not Crimes</u>

The government contends that Farias reasonably suspected Mr. Thompkins of violating three separate provisions of the Chicago Municipal Code. Gov. Opp. Br. at 2. Consequently, according to the government's theory, even if two of Farias's three suspicions proved unreasonable, the officer's actions were justified. Even just one traffic violation, standing alone, would be enough to support an investigatory stop. Gov. Resp. at 4-5. As an abstract matter of law, that position is correct. But in the context of this case, the government's position does not stand. The testimony shows that Farias did not reasonably suspect Mr. Thompkins of any traffic violation.

> *i. Mr. Thompkins Was Never Parked, And So Could Not Have Violated the Headlight Ordinance*

There is no dispute about why Mr. Thompkins initially pulled to the side of the road. He did so to allow the oncoming police SUV to pass, like any responsible driver would. The government characterizes this safety maneuver as a crime because Mr. Thompkins failed to cut his lights as he waited for the officers to pass. Tr. at 142. But to adopt that characterization would be to endorse a view the Constitution cannot countenance: that police officers can recklessly drive into oncoming traffic and punish motorists who have the good sense to get out of the way.

Federal courts across the country have repudiated reasoning of this sort. Under the "police-created exigency" doctrine, officers are forbidden from creating

exigent circumstances by violating the law and then using those same circumstances to justify a warrantless search. *See Kentucky v. King*, 563 U.S. 452, 461 (2011) (describing the evolution of the doctrine); *see also United States v. Gould*, 364 F.3d 578, 590 (5th Cir. 2004) (en banc); *United States v. Chambers*, 395 F.3d 563, 566 (6th Cir. 2005); *United States v. Coles*, 437 F.3d 361, 367 (3d Cir. 2006); *United States v. Ramirez*, 676 F.3d 755, 761 (8th Cir. 2012); and *United States v. Paulino*, 495 F. App'x 799, 801 (9th Cir. 2012).

The same reasoning applies here. Officers should not be permitted to force civilians into positions where they need to avoid oncoming traffic and then seize those same citizens for ceding to their authority. Unlike the door-knocking officers in *King*, Farias created the exigent circumstances here by engaging in conduct which would be illegal if done by a civilian. *See King, supra*, 563 U.S. at 469-71 (finding that officers who create an exigency by knocking on a door do not violate the Fourth Amendment partly because "they do no more than any private citizen might do").

And even if there had been no exigency, Mr. Thompkins still did not violate the city ordinance when he pulled to the side of the road. Unless this Court construes any instance in which a vehicle idles to be "parking," Mr. Thompkins did not break any laws when he stopped to let the officers pass. At no point did he cut the engine or shift the car into park. Instead, he placed his foot on the brake pedal until the officers drove by.

18

Only after the officers passed did Mr. Thompkins begin the *process* of parking his vehicle. Tr. at 36. But he never completed that process. The officers flashed their lights and Mr. Thompkins hit his brakes so they could approach. He was not yet positioned within the parking space, nor was his gearshift ever in park. That being the case, he could not have violated the no-lights-while-parked ordinance.

The testimony and footage make this clear. Farias testified that it appeared as though Mr. Thompkins "had his car in reverse." Tr. at 36. The video shows that Mr. Thompkins's reverse lights were illuminated when he was stopped. And before walking back to the police SUV, Farias commanded Mr. Thompkins to "put his vehicle in park." Tr. at 40. The officer "kn[e]w his vehicle was not parked" because he "observed the shifter in the reverse position." Tr. at 41.

> ii. *Because Mr. Thompkins Never Parked and South May Street Has One Lane, He Could Not Have Violated the Turn Signal Ordinance*

The turn signal violation must fall for similar reasons. The ordinance at hand prohibits drivers from changing lanes or emerging from parked positions without first signaling. Chicago Municipal Code § 9-40-200(c). So to prove a violation, the government must show that Mr. Thompkins changed lanes or emerged from a parked position. Neither scenario is possible. First, Mr. Thompkins could not have been changing lanes because there was only one lane of traffic. Tr. at 63-64. And second, as discussed above, Mr. Thompkins never parked his car, and so never emerged from a parked position. Consequently, he never violated this ordinance. No reasonable officer could have believed he did.

19

### iii. *The Officers Did Not Notice Any Obstruction-of-View Violations Until After Seizing Mr. Thompkins, and the Cited Violations Are Not Obstruction-of-View As a Matter of Law*

Finally, the officers did not notice the obstruction-of-view violation until well after the stop commenced. As discussed above, the officers' written reports are consistently inconsistent regarding both *when* they believed they saw a violation and *what* they purported to see. *See supra* at 13-14. Due to these deviations, divining exactly what happened that night presents a challenge. But because the government bears the burden of proving the reasonableness of a warrantless seizure, *Garcia-Garcia*, 633 F.3d at 612, this Court need not trouble itself with divination. The officers' lack of credibility standing alone is more than enough to render their versions of events unreliable. And in any event, even if the officers thought they were pulling over Mr. Thompkins for an obstruction of view infraction, none of the cited objects rise to the level of obstruction-of-view infractions.

The first insufficient ground cited by Farias was the cracked side mirror. By his own admission, this was not a valid reason to stop Mr. Thompkins. Tr. at 78. Only later, when writing his tickets, did he realize that Illinois law does not criminalize cracked side mirrors like the one in Mr. Thompkins's case. *Id.* Consequently, Farias declined to include any mention of the mirror in his reports. Tr. at 79. Instead, his reports and latter-day testimony cite the air freshener and the GPS mount as the offending objects.

As a matter of law, the air freshener cannot constitute a violation of Chicago Municipal Code § 9-40-250(b). That section prohibits objects that "obstruct a clear

20

view through the windshield, except required or permitted equipment of the vehicle." Even in the exceedingly unlikely event that the officers did observe the air freshener before stopping Mr. Thompkins, the government solicited no testimony tending to show that it obstructed Mr. Thompkins's view under the law.

Illinois courts have found that obstruction-of-view stops under state law must be supported by specific testimony from the officer. *People v. Cole*, 369 Ill. App. 3d 960, 970, 874 N.E.2d 81, 90 (2007) ("Absent testimony that Officer Hiland believed the beads materially obstructed defendant's view, the trial court erred in concluding that Officer Hiland had reasonable suspicion to initiate the traffic stop.") That testimony must identify *how* the object obstructed the defendant's view. *People v. Mott*, 389 Ill. App. 3d 539, 546, 906 N.E.2d 159, 163 (2009) (finding a Fourth Amendment violation because the officer "never testified how he believed the air freshener might have materially obstructed [the] defendant's view of the road"). Illinois courts have thrown out numerous obstruction-of-view traffic stops when the testifying officer failed to adequately articulate how the object disrupted the driver's line of sight. *See People v. Johnson*, 893 N.E.2d 275, 279 (4th Dist. 2008); *People v. Seybold*, Nos. 3-13, 0438, 3-13-0439, 2014 WL 1362608, *2 (3rd Dist. Apr. 4, 2014).

Farias failed to offer any testimony to this effect for either the air freshener or the GPS mount. On direct, he instead concluded without explaining that he felt "they may [have been] obstructing the view of the driver." Tr. at 36. The Fourth Amendment demands more from law enforcement. As a result, the obstruction-of-view citation cannot support this stop. Farias has proven at every juncture that he

does not deserve the benefit of the doubt. This Court should decline to read his lukewarm testimony about obstruction as "adequate articulation" of a disrupted line of sight.

### III. Farias Detained Mr. Thompkins Without Reasonable Suspicion After Completing the Traffic-Related Mission of the Initial Stop

Even if this Court finds that reasonable suspicion existed for the initial stop, the evidence should still be suppressed. When the officers completed their inquiry into the traffic violations, they should have terminated the stop. Instead, the officers here detained Mr. Thompkins beyond the time authorized by the traffic stop to pursue an unrelated criminal investigation. They did so without independent reasonable suspicion of a separate crime. As a result, they violated the Fourth Amendment.

### a. The Supreme Court in *Rodriguez* Made Clear That Any Period of Detention Beyond Completion of the Traffic-Based Mission Must Be Justified by Independent Reasonable Suspicion

In 2015, the Supreme Court decided *Rodriguez v. United States*, 135 S. Ct. 1609 (2015). The *Rodriguez* Court considered an Eighth Circuit decision holding that an extended traffic stop was permissible because police kept the defendant stopped for a negligible amount of extra time. The government in *Rodriguez* argued that the extension was permissible because it only "incremental[ly]" prolonged the detention. *Id.* at 1616. The Eighth Circuit upheld the defendant's conviction because that incremental prolongation represented a mere *de minimis* intrusion of his Fourth Amendment rights. *Id.* at 1613. The Eighth Circuit reasoned that *Pennsylvania v. Mimms*, 434 U.S. 106 (1977) compelled such a conclusion because

22

"the government's 'legitimate and weighty' interest in officer safety outweighs the '*de minimis*' additional intrusion of requiring a driver, already lawfully stopped, to exit the vehicle." *Rodriguez*, 135 S. Ct. at 1615 (citing *Mimms*, 434 U.S. at 110-11) (quotations in original).

The Supreme Court disagreed. Without additional, independent reasonable suspicion, the justification for continued detention evaporates the moment the officer completes their traffic-related mission. Any "[a]uthority for [a] seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez*, 135 S. Ct. at 1614.

The Seventh Circuit has applied this rule faithfully, reaffirming that the precise length of the extension is constitutionally irrelevant. For a *Rodriguez* analysis, the dispositive "question does not depend on exactly how many minutes the stop lasts." *United States v. Lopez*, 907 F.3d 472, 486 (7th Cir. 2018). Rather, the key inquiry is "whether law enforcement has detained the person longer than needed to carry out the investigation that was justified by the reasonable suspicion." *Id.* Even a "15-minute stop would be too long if the investigation justifying the stop finished at the 14-minute mark." *Id.*

The prosecution's arguments to the contrary are unavailing. The government maintains that the continued detention was "not unreasonable" because the officers asked Mr. Thompkins to exit his vehicle less "than six minutes" into the encounter. Tr. at 168. To support this stopwatch approach, the government cites *United States v. Johnson*, 331 F. App'x 408 (7th Cir. 2009). Tr. at 143-44. In that case, the Seventh

Circuit upheld a traffic stop prolonged by two minutes. *Johnson*, 331 F. App'x at 410 ("So when it comes down to it, what we are talking about here is roughly two minutes of delay that were not justified by the traffic violation or Johnson's statements. That is not unreasonable.").

But the government fails to mention that *Johnson* was decided in 2009, six years before *Rodriguez*. The Supreme Court's rejection of the *de minimis* standard in *Rodriguez* represented a similar rejection of the reasoning in *Johnson*. Accordingly, the Seventh Circuit has abandoned *Johnson*'s minute-ticker in favor of the stricter test employed in cases like *Lopez*, *supra*, 907 F.3d 472. Other circuits have followed suit. *See, e.g.*, *United States v. Gomez*, 877 F.3d 76 (2d Cir. 2017) (finding a stop extended when officers asked if the defendant knew anything about a local heroin operation because, "even assuming Gomez's detention lasted only five minutes, [the officer] extended the seizure to ask questions pertinent to an unrelated criminal investigation") (internal quotations omitted); *United States v. Clark*, 902 F.3d 404, 410 n.4 (3d Cir. 2018) (observing that "the brevity (20 seconds) of the criminal history questioning does not support" the government's position "given the Supreme Court's explicit rejection of a *de minimis* exception in Rodriguez"); and *United States v. Campbell*, 912 F.3d 1340, 1354-55 (11th Cir. 2019) (holding that 25 seconds of non-traffic-related questioning unlawfully prolonged the traffic stop).

The government also claims the extension of Mr. Thompkins's stop was reasonable because officer safety concerns overrode the Fourth Amendment

24

interests at stake. Tr. at 142-43. That claim too must fall. The *Rodriguez* Court squarely confronted this balancing issue and decided in favor of the Fourth Amendment interests. This balancing approach, rooted in *Mimms*, was the exact position the Supreme Court disavowed when it reversed the Eighth Circuit. *See Rodriguez*, 135 S. Ct. at 1615.

The Court even anticipated that some officers might use the authority granted by *Mimms* to circumvent *Rodriguez*'s mandates. To ward off that problem, the majority disclaimed "safety precautions taken in order to facilitate" on-scene investigation into other crimes. *Rodriguez*, 135 S. Ct. at 1616. These "detours" cannot be justified absent reasonable suspicion of those other crimes. *Id.*

Farias started down the path of just such a detour when he commanded Mr. Thompkins to exit his vehicle. He flat-out told Mr. Thompkins that he "want[ed] to make sure [Mr. Thompkins didn't] have any guns in the car." Gov. Exh. 2 at 5:27. Mr. Thompkins, in turn, repeatedly asked Farias why he planned to search the car. Tr. at 75, Gov. Exh. 2 at 5:32. Farias never denied that he intended to search the car. Instead, he continued to insist that Mr. Thompkins exit the vehicle "based on [his] history of weapons usage[.]" Gov. Exh. 2 at 5:42. This exchange occurred *after* Farias decided not to write any tickets.

The government argues that the stop was never extended because Farias lied about his decision not to write tickets and maintains that Farias lied to de-escalate a tense situation, and was still considering whether to write traffic tickets. Tr. at

167-68. For the reasons discussed in detail above, these contentions are less than credible. *See supra* at 11-14 (compiling contradictions in the officers' accounts).

Even considered in isolation, it strains logic to suggest that commands to exit a vehicle tend to de-escalate tense situations. And intentionally misleading a motorist to believe that he will not receive tickets would likely only further inflame tensions if an officer were to ultimately renege on that promise.

Because Farias has proven himself not to be credible throughout this case, and because his de-escalation narrative makes little sense on its own terms, Farias's eleventh-hour explanation of his tactics should not be credited. Instead, this Court should adopt the simpler explanation, supported by the video: that the traffic-related mission concluded when Farias decided not to issue any citations.

At oral argument, this Court raised the issue of whether *Atwater v. Lago Vista*, 532 U.S. 318 (2001) functionally ended its inquiry. Tr. at 149. Put simply, it does not. The core holding of *Atwater* is that police can arrest suspects even for suspected crimes that do not carry carceral consequences. So long as the state law affords police the power to arrest for low-level offenses, an arrest *for* such an offense is reasonable. *Id.* at 323 (recognizing that Texas law expressly authorized warrantless arrests for seatbelt violations, even though the violations were only punishable by fine).

*Atwater* did not, however, give the green light to any searches and seizures conducted following a valid traffic stop. Even if the police have probable cause to believe a suspect committed a traffic offense, they are still bound by the Fourth

26

Amendment in deciding to search the cabin, *Arizona v. Gant*, 556 U.S. 332, 344 (2009), to conduct a protective sweep, *Michigan v. Long*, 463 U.S. 1032 (1983), to pat-down passengers, *Arizona v. Johnson*, 555 U.S. 323 (2009), or to extend the stop without reasonable suspicion, *Rodriguez*, 135 S. Ct. 1609.

*Rodriguez* would be dead letter otherwise. In *Rodriguez* itself, there was no dispute that the defendant committed traffic infractions. *Rodriguez*, 135 S. Ct. at 1612-13. The officer undoubtedly had probable cause to arrest him for those infractions. But the existence of probable cause for the infractions did not cleanse the taint of the extended stop. If it did so absolve the officers, all *Rodriguez*-based cases would be moot.

> b. <u>The Government Cannot Show That the Officers Had the Reasonable Suspicion of a Separate Crime Necessary to Extend the Traffic Stop</u>

Extended stops are only permissible when supported by reasonable suspicion of separate crimes. The officers here did not extend the stop based on reasonable suspicion. Rather, the evidence suggests that they extended the stop based on nothing more than a hunch.

The government argues that reasonable suspicion supported any extension. Tr. at 170. In the government's telling, three factors support finding reasonable suspicion here: (i) Mr. Thompkins's rap sheet, (ii) his supposed nervous behavior, and (iii) the presence of a baton in the car.

Standing alone, a record of prior convictions, no matter how serious, can never establish reasonable suspicion. *United States v. Jerez*, 108 F.3d 684, 693 (7th Cir. 1997). This rule makes intuitive sense; after all, past contacts with the justice

27

system should not forever divest the contacted of their Fourth Amendment rights. Even when combined with other potentially-incriminating circumstances, a prior record does little to provide the "necessary, concrete indicia" that crime is afoot. *United States v. Castle*, 825 F.3d 625, 636 (D.C. Cir. 2016). *See also United States v. Sprinkle*, 106 F.3d 613, 617-18 (4th Cir. 1997).

Mr. Thompkins's alleged nervous behavior likewise fails to establish reasonable suspicion for at least two reasons. First, because the video evidence indicates that Mr. Thompkins did not act nervously during the stop. This evidence paints the clearest picture of what happened that night, and should be credited over Farias's shifting testimony. *See United States v. Rodriguez-Escalera*, 884 F.3d 661, 669 (7th Cir. 2018) (observing in the context of a *Rodriguez* extension that "video of the traffic stop" is "the most reliable evidence of the detainees' demeanor"). As discussed at greater length *supra* at 11-12, Broderick never claimed to witness signs of nervousness from Mr. Thompkins. To be sure, Farias's narrative on this front has changed over time. But his earliest statements—recorded just after arresting Mr. Thompkins—reflect that Mr. Thompkins "wasn't acting weird" when stopped. Tr. at 71, Gov. Exh. 2 at 24:10.

Second, any signs of nervousness exhibited by Mr. Thompkins were entirely in step with the normal level of nervousness civilians experience when detained by police. Because of this dynamic, the Seventh Circuit has recognized that generalized descriptions of nervousness should not be afforded much weight when determining whether an individual's conduct was suspicious. *United States v. Broomfield*, 417

28

F.3d 654, 655 (7th Cir. 2005) ("Whether you stand still or move, drive above, below, or at the speed limit, you will be described by the police as acting suspiciously should they wish to stop or arrest you. Such subjective, promiscuous appeals to an ineffable intuition should not be credited.") After all, a "driver's nervousness is not a particularly good indicator of criminal activity, because most everyone is nervous when interacting with the police." *United States v. Palmer*, 820 F.3d 640, 653 (4th Cir. 2016).

Finally, the mere presence of a baton cannot salvage this extended stop. Mr. Thompkins was never cited for possessing the baton, even though he was cited for the traffic violations. Nor could he have been, because baton possession is legal in Illinois. *See* 720 Ill. Comp. Stat. Ann. 5/24-1 (criminalizing "billy" possession only when a person "inten[ds] to use the [billy] unlawfully against another" (i.e., possession with specific intent) or when "carrie[d] in building occupied by a unit of government"). There is no allegation that the baton in Mr. Thompkins's car was itself contraband. Under Illinois law, no such allegation could be credibly made. The government has only stated in the most conclusory of terms that the presence of the baton furnished justification for the extended stop here. But the circumstances of Mr. Thompkins's arrest and Illinois law compel the opposite conclusion: that the baton here does not provide an independent basis for extending the traffic stop.

## CONCLUSION

For the reasons stated above, as well as those put forth in Mr. Thompkins's suppression motion and his reply in support of his suppression motion, as well as

those articulated over two days of an evidentiary hearing, it is respectfully requested that this Court grant Mr. Thompkins's motion to suppress and enter an order precluding the government from introducing into evidence a pistol seized from Mr. Thompkins's car, and further prohibit the admission of any statements made by Mt. Thompkins following his seizure and arrest on April 29, 2018.

Respectfully submitted,

FEDERAL DEFENDER PROGRAM
John F. Murphy,
Executive Director

By:     s/ *Amanda G. Penabad*
Amanda G. Penabad
Counsel for Michael Thompkins

AMANDA G. PENABAD
FEDERAL DEFENDER PROGRAM
55 E. Monroe Street, Suite 2800
Chicago, Illinois  60603
(312) 621-8340

**IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **)** | |
| | **)** | **No. 18-cr-664** |
| **v.** | **)** | |
| | **)** | **Judge Virginia M. Kendall** |
| **MICHAEL THOMPKINS** | **)** | |

**EXHIBITS TO MICHAEL THOMPKINS'S POST-HEARING
<u>MEMORANDUM IN SUPPORT OF THE MOTION TO SUPPRESS</u>**

| | |
|---|---|
| Exhibit 1 | July 10, 2018 COPA Report regarding Officer Farias |
| Exhibit 2 | April 29, 2018 Video of traffic stop undertaken by Officers Farias and Broderick approximately 20 minutes before their stop of Mr. Thompkins |
| Exhibit 3 | April 29, 2018 ShotSpotter records from the Seventh District |

**Exhibit 1**          **July 10, 2018 COPA Report regarding Officer Farias**

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**　　　　　　**LOG #1088236**

## SUMMARY REPORT OF INVESTIGATION

### I.　EXECUTIVE SUMMARY

| | |
|---|---|
| Date of Incident: | January 22, 2018 |
| Time of Incident: | 4:48 PM |
| Location of Incident: | 6402 S. Honore St. |
| Date of COPA Notification: | January 23, 2018 |
| Time of COPA Notification: | 4:01 PM |

　　　　On January 22, 2018, the complainant, ███████████, was arrested by Officers Farias and ███████ for battery and for two counts of resisting/obstructing a peace officer. ████ alleged that the officers detained him without justification and for an excessive amount of time. ████ also alleged that the officers searched inside his coat pockets, pulled him towards their police vehicle, and arrested him without justification. After reviewing available video footage and interviewing the accused officers, COPA determined the allegations that ████was detained for an excessive amount of time and that officers used excessive force to pull him were Sustained. The remaining allegations were Exonerated.

### II.　INVOLVED PARTIES

| | |
|---|---|
| Involved Officer #1: | Roger Farias, Star #9942, Employee ID ██████ Date of Appointment: December 16, 2009, Police Officer, 7th District, Date of Birth: ████████████ |
| Involved Officer #2: | ████████████████████████████ |
| Involved Civilian #1: | ███████████Date of Birth: ███████████ |

### III.　ALLEGATIONS

| Officer | Allegation | Finding |
|---|---|---|
| Officer Farias | 1. Detained ████████without justification, in violation of Rule 6 and Rule 8. | Sustained |
| | 2. Detained ██████ for excessive amount of time without justification, in violation of Rule 6. | Sustained |

1

CIVILIAN OFFICE OF POLICE ACCOUNTABILITY                    LOG #1088236

| | |
|---|---|
| 3. Searched inside ▮▮▮▮ coat pockets without justification, in violation of Rule 6. | Exonerated |
| 4. Used force without justification to pull ▮▮▮▮ to the CPD vehicle without cause when ▮▮▮▮ was not under arrest, in violation of Rule 6 and Rule 9. | Sustained |
| 5. Arrested ▮▮▮▮ without justification, in violation of Rule 6. | Exonerated |



## IV.    APPLICABLE RULES AND LAWS

**Rules**

1. **Rule 6**: Prohibits disobedience of an order or directive, whether written or oral.

2. **Rule 8**: Prohibits disrespect to or maltreatment of any person, while on or off duty.

3. **Rule 9**: Prohibits engaging in any unjustified verbal or physical altercation with any person, while on or off duty.

**General Orders**

1. **G02-04**: Prohibition Regarding Racial Profiling and Other Bias Based Policing.

2. **G03-02**: Use of Force.

3. **G06-01-04**: Arrestee and In-Custody Communications

**Special Orders**

COPA_RPT_000002

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**  LOG #1088236

---

I. **S04-13-09:** Investigatory Stop System:

---

Federal Laws

1. **Fourth Amendment to the United States Constitution:** Guarantees protection from unlawful arrest and unreasonable search and seizure to all persons in this country.

---

State Laws

1. **725 ILCS 5/107-14:** Delineates the authority for conducting an Investigatory Stop.

## V.  INVESTIGATION[1]

### a.  Interviews

COPA interviewed the complainant ▮▮▮▮▮▮▮▮ on February 5, 2018. ▮▮▮▮ related that on January 22, 2018, he was ending his work day at an urban garden near 6401 S. Honore.[2] ▮▮▮▮ was waiting to get a ride home when a marked CPD sedan approached. The police driver (Officer Farias) asked ▮▮▮▮ why he was there but ▮▮▮▮ believed the officer had seen him working at this address on at least two previous occasions. ▮▮▮▮ stated that he was holding his cellphone in his left hand and he had his right hand in his coat pocket. The officer yelled from the squad car that ▮▮▮▮ pocket looked "bulky" and asked what ▮▮▮▮ had in his pocket. ▮▮▮▮ told the officer he had nothing in there and the officer asked ▮▮▮▮ to take his hand out of his pocket. ▮▮▮▮ asked why the officer wanted him to remove his hand and told the officer to "something better to do." ▮▮▮▮ took his hand out of his pocket. The officer exited the CPD vehicle along with his partner (Officer ▮▮▮▮, approached ▮▮▮▮ and continued to state ▮▮▮▮ coat looked "bulky." ▮▮▮▮ claimed he had both hands out of his pockets at this time. ▮▮▮▮ related that he had nothing in his pockets. Both officers searched ▮▮▮▮ including searching in ▮▮▮▮ coat pockets. ▮▮▮▮ asked if he was under arrest and Officer Farias said no, but asked ▮▮▮▮ to walk to the police car. ▮▮▮▮ refused to walk to the CPD vehicle and wanted to know if he was under arrest. Officer Farias told ▮▮▮▮ he was not under arrest but wanted to ask ▮▮▮▮ questions. ▮▮▮▮ refused to answer any questions. Officer ▮▮▮▮ then had ▮▮▮▮ by the arm while the male officer was holding his other arm. ▮▮▮▮ thought the officers were trying to pull ▮▮▮▮ towards the police vehicle. ▮▮▮▮ asked why he was being detained and the officers did not give a "definitive answer." ▮▮▮▮ denied being a threat towards either officer. The officers continued trying to pull ▮▮▮▮ towards the car, which he refused to do since he was not under arrest. Shortly after, six to seven squad cars arrived on scene. Then, Officer ▮▮▮▮ told ▮▮▮▮ he was under arrest for hitting Officer Farias. ▮▮▮▮ denied hitting the male officer or resisting arrest. ▮▮▮▮ further related that he complied with the officers and allowed them to search him. ▮▮▮▮ stated that a person named ▮▮▮▮ saw ▮▮▮▮ interaction with CPD and ▮▮▮▮ family was made aware of the arrest. When ▮▮▮▮ family came to the police station and asked for ▮▮▮▮, Officer Farias told them that ▮▮▮▮ did not want to talk to anyone and he was

---

[1] COPA conducted a thorough and complete investigation. The following is a summary of the material evidence gathered and relied upon in our analysis.
[2] Att. 8

COPA_RPT_000003



fine.[3] ███ asked to make a phone call when he first arrived at the police station and to speak to a commander, both of which were denied.[4]

  COPA interviewed **Officer** ███████████ on May 3, 2018.[5] According to Officer ███, on January 22, 2018, she and Officer Farias were on routine patrol near 64th and Honoree when they saw ███████ speaking to an unknown male. Officer ███████ saw this unknown male look at the officers, then gesture at ███ ███████ proceeded to look at the officers and walk away. Before walking away, ███████ reached toward his pocket and had his left hand in his pocket. Officer ███████ stated that the unknown male was not questioned or detained by her or her partner. Officer Farias attempted to speak to ███████ who ignored the officers. Officer ███████ then exited the police car, saw ███████ had a bulge, and asked ███████ to take his left hand out of his pocket. ███████ refused, causing Officer Farias to think ███████ was possibly armed. Officer Farias responded by grabbing ███████ by the jacket and left arm, causing ███████ to stiffen his body. Once Officer Farias' pulled ███████ left arm out of his pocket, ███████ hand was in a fist. Then, Officer ███████ exited the police vehicle and approached. ███████ grabbed Officer Farias' arm and Officer ███████ told ███████ not to touch Officer Farias multiple times. When Officer ███████ grabbed ███████ arm to remove it from her partner's arm, ███████ started flailing his arm and telling her not to touch him. At that point, ███████ was under arrest for battery to a police officer and Officer ███████ tried to handcuff him. Officer ███████ was unable to get ███████ into handcuffs because he was flailing his arms, so she requested backup. According to Officer ███████ she told ███████ to go to the police vehicle after he had already touched Officer Farias. After watching her body worn camera (BWC) footage, Officer ███████ stated she wanted ███████ to go to the police car before he was arrested because they were completing an investigatory stop and ███████ refused to provide identification. Officer ███████ did not initially tell ███████ why he was under arrest because she did not feel she had to and because he was uncooperative. ███████ was not answering her questions so she did not think she had to answer his. Officer ███████ described ███████ as aggressive and non-cooperative. She related he was loud, ignored verbal commands, flailed his arms, and grabbed Officer Farias' forearm with his right hand. Per Officer ███████ she searched ███████ pockets after he was under arrest. Officer ███████ did not remember if Officer Farias performed a protective pat down on ███████ before the arrest. Officer ███████ denied having previously interacted with ███████ or knowing he was outside of his workplace. Officer ███████ related she did not ask ███████ for his name and only for identification because subjects of street-stops often lie to police.

  On May 3, 2018, COPA interviewed **Officer Roger Farias**.[6] Officer Farias related that on January 22, 2018, he was on routine patrol when he encountered ███████ and performed a street-stop. Officer Farias was in his squad car, saw ███████ on the sidewalk with an unknown male, and approached. The two men looked at the officers and separated. ███████ walked in the opposite direction while the unknown male looked towards the officers and motioned towards ███████ Officer Farias then turned his attention towards ███████ who was looking towards the officers and holding an unknown object in his left coat pocket. Officer Farias observed a quick arm movement

[3] While ███████ complained that Officer Farias did not allow his family to see him or provide his with family information. Per General Order G06-01-04, the officer was not out of policy and this allegation was not served.
[4] Per General Order G06-01-04, Officer Farias was not out of policy and the allegations that he denied ███████ a phone call and access to the commander were not served.
[5] Att. 29
[6] Att. 34

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**                    **LOG #1088236**

between the two men, which the officer suspected was a drug transaction. Officer Farias also suspected ████ had a weapon in his pocket because he saw a bulge. Officer Farias stated he had reasonable suspicion that a crime had occurred or was about to occur, so he detained ████ The unknown male was not questioned or detained because Officer Farias and Officer ████ were busy with ████ and the unknown subject left. Officer Farias was in his vehicle and tried to talk to ████ but ████ ignored the officer and kept walking. Officer Farias then exited the vehicle to talk to ████ and asked to see his hand. ████ continued to ignore Officer Farias and did not remove his hand from his pocket. Officer Farias then closed the distance to see what was in ████ pocket and did a protective pat-down. Officer Farias was able to grab ████ arm and see inside ████ pocket while holding ████ arm, observing a cellphone and miscellaneous items. Officer Farias was able to determine ████ did not have a weapon. However, the detention was not over because ████ was resisting and placed hands on Officer Farias. After reviewing his BWC video, Officer Farias elaborated that he looked inside ████ jacket pocket before ████ grabbed the officer's arm.

████ was not handcuffed because Officer Farias initially tried to detain him and because he was flailing his arms. Per Officer Farias, they asked ████ to go towards their car because he was in custody. After watching his BWC footage, Officer Farias stated that Officer ████ told ████ to go to the car because the officers prefer performing street-stops in front of the squad car. Officer Farias stated that the interaction changed from a street-stop to an arrest after ████ flailed his arms, pulled away, and grabbed Officer Farias's arm. Officer Farias elaborated that ████ grabbed the officer's arm "to defeat arrest."[7] ████ was not told why he was being detained or arrested because Officer Farias did not want ████ to become combative. After Officer ████ requested assisting units, ████ was flailing more -- in what Officer Farias thought was an attempt to defeat arrest. Further, Officer Farias was in fear of receiving a battery from ████ Officer Farias denied that he arrested ████ for not cooperating. Officer Farias denied having interacted with ████ and did not know ████ was outside of his workplace. At the police station, some of ████ coworkers arrived but the officer told them he could not provide any information since ████ is an adult. Officer Farias could not remember exactly what these individuals asked him, but he told them there was nothing they could do. Officer Farias described ████ as evasive, uncooperative, and aggressive. Officer Farias did not search inside ████ pockets until after the arrest.

### b. Digital Evidence

**Video surveillance** was obtained of ████ arrest from I Grow Chicago, located at 6401 S. Honore.[8] On January 22, 2018 at roughly 4:49 PM, a marked CPD SUV parked in front of ████ remained standing on the street until the officers exited their vehicle several seconds later, also at 4:49 PM. Officer Farias was seen engaging with ████ while Officer ████ approached. Officer Farias made arm motions, which may have been the officer searching ████ Due to the video's poor quality, it is unclear what exactly was occurring. At about 4:51 PM, Officer ████ appeared to pull ████ followed by ████ making an arm gesture. At about 4:52 PM, a second police car arrived on scene, followed shortly by several additional assist units.

---

[7] 13:30 minute mark
[8] Att. 23

CIVILIAN OFFICE OF POLICE ACCOUNTABILITY                    LOG#1088236

     **POD footage** was obtained from 6401 S. Wolcott.[9] No relevant content from ████
January 22, 2018 arrest was recorded by this POD.

     **Body Worn Camera** (BWC) footage was obtained from both accused officers.[10] This
footage is summarized below.

### Officer Farias

     Per Officer Farias' BWC, he and Officer ████ approached ████ in their vehicle at
approximately 4:49 PM. Officer Farias exited the vehicle and asked to see ████ hand, which
████ refused. Officer Farias pulled ████ left arm/jacket sleeve. Officer Farias kept pulling
on ████ left arm and ████ continued to resist and tell the officer to let him go.[11] At about
4:50 PM, Officer Farias told ████ to come to the car and Officer ████ told ████ not to
touch her partner. At roughly 4:50 PM, ████ told the officers he did not want to go to their car.
Shortly after, Officer ████ grabbed ████ right arm. Officer Farias asked ████ if he had
any weapons, which ████ denied. ████ refused to go with the officers and Officer ████
tried to maintain a grip of ████ right hand while ████ tried to pull away. At approximately
4:52 PM, ████ asked if he was under arrest and Officer Farias told ████ he was being
detained. ████ asked the officer why he was being detained and Officer Farias related he was
trying to talk to ████ At roughly 4:51 PM, Officer Farias told ████ he had a bulge "right
there." Meanwhile, ████ kept trying to get his arm away from Officer ████ and Officer
████ kept gripping ████ right arm and telling ████ to stop.[12] Officer ████ asked
████ for identification and ████ responded by again asking what he was being stopped for.

     At about 4:52 PM, two additional officers arrived in a marked SUV. At approximately 4:52
PM, Officer ████ told ████ he was under arrest and grabbed her handcuffs. When ████
asked what he was being arrest for, Officer ████ related she would explain it to him at the
police station. ████ would not give his hands to Officer ████ and kept asking what he was
being arrested for. At least two additional marked vehicles arrived at roughly 4:52 PM. ████
was then handcuffed by Officer ████ at about 4:53 PM. Both arresting officers searched
████ pockets. Officer ████ told ████ he was under arrest for battery to a police officer
and that she told him not to touch her partner multiple times. Officer Farias put ████ into his
police car at roughly 4:55 PM. At this time, Officer Farias told ████ that ████ did not remove
his hands from his pockets when asked, that ████ would find out his charges later, and that
████ would cooperate next time. Officer Farias also told ████ "you gotta listen to police."

     Officer Farias drove away from the scene at about 4:56 PM and arrived at the police station
at about 5:01 PM. At about 5:03 PM, ████ asked to speak with Commander Johnson and Officer
Farias told ████ the commander was busy. At about 5:04 PM, Officer Farias told ████ that
when an officer approaches and tells you to remove your hand from your pocket and you do not,

[9] Att. 22
[10] Att. 26
[11] See Photo 1
[12] See Photo 2

COPA_RPT_000006

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY** **LOG #1088236**

that gives the officer a right to touch you. At about 5:07 PM, Officer Farias told ▮▮▮ that if he
does not like officers touching him, he should have done what the officers instructed.



Photo 1



Photo 2

*Officer* ▮▮▮

    Officer ▮▮▮ BWC began at about 4:49 PM with Officer Farias talking to ▮▮▮
from the police car before parking.[13] Both officers exited and approached ▮▮▮ on the sidewalk.
Officer Farias was seen grabbing ▮▮▮ left arm and ▮▮▮ was heard telling Officer Farias to
stop touching him.[14] At approximately 4:50 PM, ▮▮▮ put his right arm on Officer Farias left
arm while Officer Farias was grabbing ▮▮▮ left arm with both of his hands.[15] ▮▮▮ again
touched Officer Farias' left arm with his right hand and Officer ▮▮▮ grabbed ▮▮▮ right
arm to stop him. Both officers kept grabbing ▮▮▮ by his left and right arms respectively. ▮▮▮

---

[13] Officer ▮▮▮ BWC footage was similar to Officer Farias', Therefore, duplicate details were omitted from the
summary of Officer ▮▮▮s BWC.
[14] See Photo 3
[15] See Photo 4

CIVILIAN OFFICE OF POLICE ACCOUNTABILITY                    LOG #1088236

responded by pulling his arms away and telling the officers to stop touching him. At about 4:53 PM, Officer ██████ removed her Taser and pointed it at ██████ with the laser's visible on ██████ chest.[16] ██████ was handcuffed by Officer ██████ with Officer Farias and an assisting officer holding ██████ arms.



Photo 3



Photo 4

[16] See Photo 5

8

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**                    **LOG #1088236**



Photo 5

### c.  Physical Evidence

No physical evidence was obtained for the present investigation.

### d.  Documentary Evidence

An **Arrest Report** was obtained from ▮▮▮ January 22, 2018 arrest with **RD #JB125662**.[17] ▮▮▮ was charged with misdemeanor battery and two misdemeanor charges of resisting/obstructing a police officer. Per this report, Officers Farias and ▮▮▮ were on "routine patrol" when ▮▮▮ was observed looking in the officers' direction before walking north. The officers saw ▮▮▮ "immediately reach into his left jacket pocket and turned away […] as if he was attempting to conceal an unknown object." When the officers approached ▮▮▮ Officer Farias "observed a large bulge" in ▮▮▮ left coat pocket. ▮▮▮ refused to remove his hand from his pocket and "became irate." Officer Farias grabbed ▮▮▮ left arm. ▮▮▮ "stiffened his body and aggressively grabbed" Officer Farias' arm. Officer ▮▮▮ then grabbed ▮▮▮ hand off Officer Farias, "when arrestee began to flail his arm away from" Officer ▮▮▮ Officer Farias continued holding ▮▮▮ who again grabbed Officer Farias. Officer ▮▮▮ then told ▮▮▮ he was under arrest and tried to handcuff him, but ▮▮▮ pulled his arm away and flailed his arm. Assisting units arrived and ▮▮▮ was arrested.

An **Original Case Incident Report** was identified for **RD #JB125662**.[18] This report included similar content to the arrest report, but elaborated that ▮▮▮ appeared to be concealing an object in his coat pocket and looked towards Officers Farias and ▮▮▮ "multiple times." The officers tried to complete a field interview with ▮▮▮ but he did not respond. Officer Farias asked ▮▮▮ what he was holding and the officers approached him on foot. When ▮▮▮ refused to remove his left hand from his pocket, Officer Farias grabbed ▮▮▮ left hand. ▮▮▮ "tightened the muscles refusing to show [his] left hand," leading Officer Farias to believe

---

[17] Att. 9
[18] Att. 10

COPA_RPT_000009

had a weapon. Next, Officer ▮▮▮▮ assisted in detaining ▮▮▮▮▮▮ began flailing his right arm, so she requested assisting units. ▮▮▮ tried to pull away from Officer Farias and both officers gave ▮▮▮ verbal commands. When assisting units arrived, ▮▮▮ released Officer Farias' arm and ▮▮▮ was placed into custody.

 **Inventory Reports** were obtained from ▮▮▮ January 22, 2018 arrest.[19] Neither a gun or narcotics were not recovered from ▮▮▮ per this document.

 Lastly, an **Investigative Stop Report** (ISR) was identified for ▮▮▮ from January 22, 2018.[20] This report contained similar content to the Arrest Report and Original Case Incident Report detailed above.

## VI. ANALYSIS

 First, COPA believes that Officer Farias and ▮▮▮ observed ▮▮▮ and were suspicious of his behavior, however based on the information they articulated to COPA we find that their actions were not justified. At its inception the officer's detention of ▮▮▮ lacked reasonable, articulable suspicion to detain. The officers attempted a consensual street stop to which, by all accounts, ▮▮▮ attempted to avoid. Yet, the officers detained ▮▮▮ in violation of his constitutional rights.

 In opposition, Officer Farias stated he suspected ▮▮▮ was engaged first in a narcotics transaction and upon approach suspected ▮▮▮ to be armed. It is problematic that Officer Farias first articulated his suspicions of a narcotics transactions to COPA and omitted those observations from the Arrest Report, Original Case Incident Report, and Investigative Stop Report. Moreover, Officer Farias description of the transaction to COPA lacks any specific detail that would even rise to the level of reasonable suspicion. Officer Farias does not claim he saw an exchange of money, an exchange of any item or the retrieval of an item from a secret location. In fact, the only basis for his suspicion is that two individuals looked in the officer's direction and separated.

 When an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business. *Florida* v. *Royer*, 460 U. S. 491 (1983), at 498. And any "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *Florida v. Bostick*, 501 U. S. 429, 437 (1991). In the instant case, Officer Farias' articulation for the stop does not constitute a reasonable belief a narcotics transaction occurred. Further, in the BWC the officers never articulate any basis for the stop to ▮▮▮ and instead argue to ▮▮▮ his failure to follow their commands grants them the right to detain.

 However even if Officer Farias' basis for the stop was enough, the Court in *Terry* recognized that an officer can detain an individual to resolve the ambiguity between a seemingly innocent act and one that may implicate a crime. 392 U. S. 1 at 30 (1968). Officer Farias told COPA that after detaining ▮▮▮ he could see inside his pocket and was able to determine that he did not possess a weapon. The BWC confirms this version. Officer Farias is seen approaching and ▮▮▮ has a

---

[19] Att. 24
[20] Att. 39

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**       **LOG #1088236**



plastic water bottle pinned to his body with his forearm while his hand is in his pocket. As Officer Farias grabs ▌▌▌ arm the bottle falls to the ground and Officer Farias never pats ▌▌▌ down or makes any moves to indicate a further search for weapons or guns. A verbal standoff occurs until Officer ▌▌▌ decides to arrest ▌▌▌

In sum, while it is believable Officer Farias thought something suspicious was occurring, his basis for the detention is simply not particularized to amount to reasonable and articulable suspicion. Moreover, even had Officer Farias possessed reasonable articulable suspicion to detain and frisk ▌▌▌ by his own admission, Officer Farias' suspicions of criminal activity were dispelled: but ▌▌▌ and yet ▌▌▌ was still not free to leave. Therefore, Allegation 1 and 2 against Officer Farias and Officer ▌▌▌ that they detained ▌▌▌ without justification and detained him for an unreasonable amount of time, are Sustained.

Allegation 3, that Officers ▌▌▌ and Farias searched inside ▌▌▌ coat pockets without justification, is Exonerated. Both officers admitted to searching ▌▌▌ pockets, but not until after he was arrested. As seen in Officer Farias' BWC, he approached ▌▌▌ but the first several seconds of the interaction cannot be seen on camera. Per Officer Farias, he was doing a plain-touch pat down. ▌▌▌ also reported that Officer Farias approached and searched him. However, ▌▌▌ was not clear in his statement as to exactly when the officers searched inside his pockets. BWC shows the officers searching inside ▌▌▌ pockets after he was arrested and in handcuffs. During his COPA interview, ▌▌▌ also related that the officers searched inside his bookbag after he was arrested. Per S04-13-09, officers can perform a protective pat down during an investigatory stop limited to a "pat down of the outer clothing of a person." Had the officers searched inside his pockets prior to arrest, this allegation would be sustained. However, since the search occurred after arrest, Allegation 3 against the officers is Exonerated.

Allegation 4 against both officers, they used force without justification to pull ▌▌▌ to the CPD vehicle without cause when ▌▌▌ was not under arrest, is Sustained. However, Allegation 5, that Officers Farias and ▌▌▌ arrested ▌▌▌ without justification, is Exonerated. Both officers acknowledged they wanted ▌▌▌ to go to their car before he was under arrest because they prefer performing street investigations near their squad car. As argued above, the officers never possessed reasonable articulable suspicion and even if they did their suspicions were already been dispelled by that point. Despite a lack of particularized suspicion, the officers still had hands on ▌▌▌ and tried to pull him towards their car. Per Special Order S04-13-09, "absent reasonable articulable suspicion or probable cause, that person must be free to walk away at any time." ▌▌▌ was not free to leave as the officers were physically detaining him and trying to pull him towards their vehicle. Per General Order G03-02, the use of physical contact by a department member must be reasonable, necessary, and proportional. The force used to pull ▌▌▌ arms was not reasonable or necessary. The officers should not have even been detaining him at that point. ▌▌▌ was not a threat and the officers were not serving a lawful purpose by pulling him towards their vehicle. Rather, the force seemed punitive because ▌▌▌ was being difficult. However, despite the unlawful detention, the BWC footage clearly shows ▌▌▌ pulling his wrist from Officer ▌▌▌ grip and grabbing Officer Farias' forearm. Therefore, the officers were justified in arresting ▌▌▌ Therefore, Allegation 4 is Sustained while Allegation 5 is Exonerated.

11

CIVILIAN OFFICE OF POLICE ACCOUNTABILITY                    LOG #1088236

Finally, ██████ alleged that Officer Farias did not allow his family to visit at the police station, denied ██████ a telephone call, and denied ██████ access to a commander. All three allegations were determined not to be misconduct, and therefore Officer Farias was not served. According to General Order G06-01-04, visitors are allowed unless "it would not be prudent to do so at that time." As ██████ had just been arrested and was being processed, it was not prudent to interrupt that process with visitors. Further, this General Order states that officers can only share communication with or to an arrestee "for appropriate police purposes." Therefore, it would have been inappropriate for Officer Farias to share details about ██████ arrest with his family. Further, a phone call is allowed "within a reasonable period of time." Again, ██████ had just been arrested. He needed to be processed before a phone call would be reasonable. Lastly, arrestees are not guaranteed access to commander on demand. Officer Farias not bringing ██████ to a commander was not misconduct.

## VII.   CONCLUSION

Based on the analysis set forth above, COPA makes the following findings:

| Officer | Allegation | Finding |
|---|---|---|
| Officer Farias | 1.  Detained ██████ without justification, in violation of Rule 6 and Rule 8. | Sustained |
| | 2.  Detained ██████ for excessive amount of time without justification, in violation of Rule 6. | Sustained |
| | 3.  Searched inside ██████ coat pockets without justification, in violation of Rule 6. | Exonerated |
| | 4.  Used force without justification to pull ██████ to the CPD vehicle without cause when ██████ was not under arrest, in violation of Rule 6 and Rule 9. | Sustained |
| | 5.  Arrested ██████ without justification, in violation of Rule 6. | Exonerated |
| ██████ | ██████ | |
| | ██████ | |
| | ██████ | |

**CIVILIAN OFFICE OF POLICE ACCOUNTABILITY**          **LOG #1088236**

Approved:

_____

Andrea Kersten
*Deputy Chief Administrator – Chief Investigator*

7/10/18
Date
_____

13

CIVILIAN OFFICE OF POLICE ACCOUNTABILITY                    LOG #1088236

### Appendix A

Assigned Investigative Staff

| Squad#: | Four |
|---|---|
| **Investigator:** | Kelsey Fitzpatrick, #61 |
| **Supervising Investigator:** | James Murphy-Aguilu, #19 |
| **Deputy Chief Administrator:** | Andrea Kersten |

14

**Exhibit 2**        **April 29, 2018 Video of traffic stop undertaken by Officers Farias and Broderick approximately 20 minutes before their stop of Mr. Thompkins**

The video contained in Exhibit 2 will be provided by courtesy copy to the Court and the government.

**Exhibit 3**        **April 29, 2018 ShotSpotter records from the Seventh District**

AO 89B  (07/16)  Subpoena to Produce Documents, Information, or Objects in a Criminal Case

# UNITED STATES DISTRICT COURT
### for the
### Northern District of Illinois

13 MAR 19 13    30

| United States of America | ) |
| v. | ) |
| **MICHAEL THOMPKINS** | )   Case No.  18 CR 664 |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR
## OBJECTS IN A CRIMINAL CASE

To:  CHICAGO POLICE DEPARTMENT
ATTN: KEEPER OF RECORDS
3510 S MICHIGAN AVE., CHICAGO IL 60653

*(Name of person to whom this subpoena is directed)*

**YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following books, papers, documents, data, or other objects:

**PLEASE SEE ATTACHED.**

| Place: | Dirksen Federal Courthouse<br>219 S Dearborn St., Chicago IL 60604<br>Judge Virginia Kendall | Date and Time:    03/15/2019 11:00 am |
|---|---|---|

Certain provisions of Fed. R. Crim. P. 17 are attached, including Rule 17(c)(2), relating to your ability to file a motion to quash or modify the subpoena; Rule 17(d) and (e), which govern service of subpoenas; and Rule 17(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

*(SEAL)*

Date:  **MAR 1 3 2019**

**THOMAS G. BRUTON**
*CLERK OF COURT*

_____
*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*
**MICHAEL THOMPKINS**                                                  , who requests this subpoena, are:

AMANDA G. PENABAD, FEDERAL DEFENDER PROGRAM, 55 E MONROE ST., SUITE 2800, CHICAGO, IL 60604

### Notice to those who use this form to request a subpoena

Before requesting and serving a subpoena pursuant to Fed. R. Crim. P. 17(c), the party seeking the subpoena is advised to consult the rules of practice of the court in which the criminal proceeding is pending to determine whether any local rules or orders establish requirements in connection with the issuance of such a subpoena. If no local rules or orders govern practice under Rule 17(c), counsel should ask the assigned judge whether the court regulates practice under Rule 17(c) to 1) require prior judicial approval for the issuance of the subpoena, either on notice or ex parte; 2) specify where the documents must be returned (e.g., to the court clerk, the chambers of the assigned judge, or counsel's office); and 3) require that counsel who receives produced documents provide them to opposing counsel absent a disclosure obligation under Fed. R. Crim. P. 16.

Please note that Rule 17(c) (attached) provides that a subpoena for the production of certain information about a victim may not be issued unless first approved by separate court order.

## Attachment

All reports, including but not limited to ShotSpotter alerts or reports, identifying potential shots fired incidents within the Chicago Police Department's (CPD's) **7th District** on **April 29, 2018,** between the hours of **2:00pm and 10:30pm.**

The requesting party will accept CPD's return by facsimile or email in order to expedite compliance with this subpoena. Return of subpoenaed materials is requested by March 15, 2019.

Any correspondence related to this subpoena, including questions or concerns from CPD, should be directed to:

Amanda Penabad
Federal Defender Program
55 E. Monroe St. Ste. 2800 Chicago, IL 60603

Amanda ██████████████

(312) ████████████

(312) ████████████

United States of America v. Michael Thompkins
18 CR 664



## ShotSpotter
### FLEX

Chicago, IL

## Details Report for Flex ID:209654



| | |
|---|---|
| Address: | 1701 West 63rd Street |
| District & Beat: | 0725 |
| Latitude, Longitude | 41.779015, -87.666888 |
| Date & Time: | 04/29/2018 16:07:28 |

1 ROUND and Possibly mislocated, dispatch 'near the area of' not precise address

## Notes

| Created By | Date & Time | Note |
|---|---|---|
| shotspotter\dfoley | 04/29 16:08 | Published |
| pc0y430@chicagopc | 04/29 16:08 | Acknowledged at customer facility |

This software contains proprietary, confidential, and copyrighted data. Use of this software and data is restricted to authorized SST customers pursuant to their license agreement with SST, Inc. The software and data may not be used for any purposes other than those explicitly authorized by the SST license agreement and may not be distributed outside the licensed customer's department without the express, written permission of SST, Inc. Copyright (c) 2014 SST, Inc. All rights reserved. US and foreign patents and/or trademarks apply as described at: www.shotspotter.com/patents

# ShotSpotter FLEX

Chicago, IL

## Details Report for Flex ID:209666



© 2019 Microsoft Corporation

| | |
|---|---|
| Address: | 6004 South Bishop Street |
| District & Beat: | 0713 |
| Latitude, Longitude | 41.784747, -87.661296 |
| Date & Time: | 04/29/2018 18:47:25 |

7 ROUNDS

## Notes

| Created By | Date & Time | Note |
|---|---|---|
| shotspotter\kantolik | 04/29 18:48 | Changed number of rounds from 4 to 7 |
| shotspotter\kantolik | 04/29 18:48 | Published |
| pc0y430@chicagopc | 04/29 18:48 | Acknowledged at customer facility |

Date & time of report: 03/20/2019 06:47:33

page 1 of 1

This software contains proprietary, confidential, and copyrighted data. Use of this software and data is restricted to authorized SST customers pursuant to their license agreement with SST, Inc. The software and data may not be used for any purposes other than those explicitly authorized by the SST license agreement and may not be distributed outside the licensed customer's department without the express, written permission of SST, Inc. Copyright (c) 2014 SST, Inc. All rights reserved. US and foreign patents and/or trademarks apply as described at: www.shotspotter.com/patents