IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) <br> ) <br> ) <br> ) |
| v. | ) No. 18 CR 664 <br> ) <br> ) Judge Virginia M. Kendall |
| MICHAEL THOMPKINS | ) <br> ) <br> ) |

**MEMORANDUM OPINION AND ORDER**

Defendant Michael Thompkins was charged on October 2, 2018, with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (Dkt. 1). The indictment stemmed from Thompkins' arrest on April 29, 2018 by the Chicago Police Department. Thompkins, through his attorney, moved to suppress evidence of the firearm recovered during his arrest along with any post-arrest statements. (Dkt. 24). The Court held an evidentiary hearing on the Motion to Suppress on March 8, 2019 and March 15, 2019, to resolve factual disputes relevant to the Motion. Both parties also submitted post-hearing position papers. For the following reasons, Thompkins' Motion to Suppress is denied.

**BACKGROUND**

At the evidentiary hearing, the government presented the testimony of Chicago Police Department Officers Roger Farias and Sam Broderick. The government also presented dash camera video footage from the officers' police vehicle

(Government Exhibit 1) and Officer Farias' body worn camera (Government Exhibit 2).

On the evening of April 29, 2018, Officers Farias and Broderick were on routine patrol in a marked police vehicle. (Hearing Tr. at 29:1-19). The officers were driving North on South May Street approaching 62nd Street. (*Id.* at 32:12-33:2). South May Street is a one-way southbound street and the officers were driving against the flow of traffic. (*Id.* at 33:1-8). While driving northbound on May Street, Officer Farias observed Thompkins' vehicle driving southbound approaching the intersection of South May and 62nd. (*Id.* at 35:4-11). Officer Farias observed Thompkins pull over to the side of the road without using a turn signal and with Thompkins' headlights remaining on at all times. (*Id.* at 35:12-20). Eventually, Officer Farias crossed the intersection of South May and 62nd and drove post Thompkins' stopped vehicle. (*Id.* at 36:1-2). While driving by, Officer Farias observed that the vehicle was illegally parked, had its headlights on, and observed "objects in the mirror" that "may be obstructing the view of the driver." (*Id.* at 36:3-6). Specifically, Officer Broderick noticed that Thompkins "had a large air freshener and a phone holder blocking the center windshield." (*Id.* at 108:13-18); *see also* Gov. Exh. 1. at 00:30-00:35. The officers proceeded to drive past Thompkins' vehicle and then conducted a U-turn. (*Id.* at 36:7-9). In the process of turning around, Officer Farias observed Thompkins pull out from the parallel parking spot without using a turn signal and then pull into a different spot. (*Id.* at 36:10-15). After turning around, Officer Farias pulled up behind Thompkins' vehicle, turned on the police vehicle's emergency lights, and

approached Thompkins' vehicle. (*Id.* at 37:1-2). The officers stopped Thompkins shortly after 9:00 p.m. (*Id.* at 104:24-105:2).

Officer Farias approached the driver's side door of Thompkins' vehicle while Officer Broderick approached the passenger side. (*Id.* at 37:23-38:3). During the initial questioning, Officer Farias testified that Thompkins appeared to be shaking, nervous, and was sitting "very awkward[ly]" and "very close to the steering wheel, more like concealing his lower half of his body." (*Id.* at 40:3-14). Officer Farias' impression of this behavior was that Thompkins was being "evasive" and didn't want the officers to look near his lower body. (*Id.* at 40:15-22). Once Officer Farias was in possession of Thompkins' driver's license and registration documentation, he returned to his police vehicle to conduct a name check and criminal history check. (*Id.* at 41:10-13). The criminal history check returned approximately four hits for Thompkins' unlawful use of a weapon. (*Id.* at 42:4-20). Officer Farias testified that Thompkins' criminal history elevated his concern for his and his partner's safety. (*Id.* at 42:21-43:3).

Officer Farias then returned to Thompkins' vehicle and questioned him about the prior gun related convictions "to see [Thompkins'] reaction" and "get more information out of him." (*Id.* at 43:9-12). In response to this questioning, Officer Farias noticed Thompkins became defensive and tried to avoid the subject. (*Id.* at 43:13-17). On the body worn camera footage, Officer Broderick can be heard speaking to Officer Farias at the 5:04 mark. Gov. Exh. 2; (Hearing Tr. at 112:3-17). Thompkins responds to this by asking, "a baton, where you see that at?" Gov. Exh. 2. at 5:11.

Upon hearing this, both officers scan the interior of the vehicle with their flashlights. Gov. Exh. 2. at 5:11-5:22. Officer Broderick had, in fact, observed a wooden baton near the center console of the vehicle. (Hearing Tr. at 112:6-22). Officer Farias then informed Thompkins that he would not be issuing any tickets, but he would like Thompkins to step out of the car to ensure there are no guns in the car. Gov. Exh. 2. at 5:24. Officer Farias testified that he issued this order "because of safety, and [Officer Farias] wanted [Thompkins] away from the baton." (Hearing Tr. 45:10-16). Additionally, Officer Farias testified that he hoped that by telling Thompkins he was not going to issue any tickets that he could deescalate the situation and calm down Thompkins. (*Id.* at 46:3-7). At the time he said this, neither of the officers had decided whether they were going to actually issue any tickets. (*Id.* at 46:19-47:2, 113:10-16). While refusing to step out of his vehicle, Thompkins requested Officer Farias to call a "Lieutenant." Gov. Exh. 2. at 5:48-5:59. Sergeant Brown, Officer Farias' supervisor, arrived on the scene approximately six minutes after Thompkins made his request. Gov. Exh. 2. at 11:40; (Hearing Tr. 48:22-49:3). After talking with Sergeant Brown for several minutes, Thompkins was removed from his vehicle. Gov. Exh. 2. at 18:40. Immediately after Thompkins' removal, Officer Farias observed and recovered a handgun located on the driver's seat where Thompkins had obviously been sitting on it. (Hearing Tr. 49:21-50:12).

## DISCUSSION

Thompkins argues that the stop conducted by Officers Farias and Broderick was done in violation of the Fourth Amendment because the officers did not observe

Thompkins commit any traffic violations. In the alternative, Thompkins asserts that the officers unnecessarily prolonged the stop and detained Thompkins without reasonable suspicion. The government responds that the officers had several valid justifications for initially stopping Thompkins and that any extension of the traffic stop was justified to complete the mission of the traffic stop or supported by independent reasonable suspicion.

Thompkins initially attacks the credibility of Officer Farias' testimony and argues that the government simply cannot meet their required burden because of certain inconsistencies and the disciplinary record of Officer Farias. Thompkins' efforts are misplaced, and the Court need not dispose of Officer Farias' testimony. Such an argument loses focus that a reasonable suspicion determination is "viewed from the standpoint of an objectively reasonable officer" and not purely on the subjective views of the arresting officer. *See Whren v. United States,* 517 U.S. 806, 813 (1996) ("[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.") (internal quotations omitted); *see also Ornelas v. United States,* 517 U.S. 690, 696 (1996). As the arresting officer, Officer Farias' testimony is certainly probative and valuable in making factual determinations, but here the Court has the added benefit of actual video footage of the events that transpired leading up to Thompkins' arrest and recovery of the firearm. At the suppression hearing, Officers Farias and Broderick offered credible testimony that

was largely consistent and further supported by the footage that was captured that evening by the dash camera and body warn video. Despite Officer Farias' testimony regarding the ShotSpotter report and his previous Civilian Office of Police Accountability investigation, his testimony, supported by the captured video footage, demonstrates that there was an objective basis to form a reasonable belief that Thompkins had violated the law.

**I. Reasonable Suspicion Supporting the Initial Stop**

Before conducting a traffic stop, police officers must have reasonable suspicion which amounts to "a particularized and objective basis for suspecting the particular person stopped" has violated the law. *Navarette v. California,* 572 U.S. 393, 396 (2014); *see also Whren,* 517 U.S. at 810 ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."). "Reasonable suspicion arises from the combination of an officer's understanding of the facts and his understanding of the relevant law." *Heien v. North Carolina,* 135 S. Ct. 530, 536 (2014). Reasonable suspicion is always determined through the lens "of an objectively reasonable police officer." *Ornelas,* 517 U.S. at 696. Beyond reasonable suspicion, once an officer "has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista,* 532 U.S. 318, 354 (2001) (holding that officers did not violate the Fourth Amendment by arresting and taking woman into custody for failing to fasten her seatbelt and failing to provide proof of insurance). The

constitutionality of an officer's actions is not limited by the justifications the officer provides at the time of the detention. *See Devenpeck v. Alford,* 543 U.S. 146, 154 (2004).

**A. Head lamp violation**

The government first argues that the officers had reasonable suspicion to believe that Thompkins violated Chicago's municipal code regarding the use of headlights on parked vehicles. MCC § 9-76-090(c) states that "[a]ny lighted head lamps upon a parked vehicle shall be depressed or dimmed." Indeed, both officers testified that they noticed Thompkins' vehicle parked on the side of the street with the headlights on as they approached. (Hearing Tr. at 35:12-25, 107:17-108:2). However, as made clear by the dash camera footage, Thompkins remained in his vehicle while the officers approached and eventually passed him. The Municipal Code defines "Parking (to park)" as "the standing of an *unoccupied vehicle* otherwise than temporarily for the purpose of and while actually engaged in loading or unloading property or passengers." MCC § 9-4-010 (emphasis added). Because Thompkins' vehicle was occupied, as a matter of law he could not have violated § 9-76-090(c). The question then becomes whether the officers' belief that Thompkins committed this infraction can still serve as reasonable suspicion justifying the stop.

The Fourth Amendment does not demand perfection from police officers as mistakes are inevitable, especially in fast-paced and high-pressure situations. *Heien,* 135 S. Ct. at 536. Mistakes of fact and of law do not necessarily amount to Fourth Amendment violations. "Reasonable suspicion arises from the combination of an

officer's understanding of the facts and his understanding of the relevant law. The officer may be reasonably mistaken on either ground." *Id*. As with any Fourth Amendment analysis, the foundation of the inquiry is one of reasonableness and any "mistakes—whether of fact or of law—must be *objectively* reasonable." *Id*. at 539 (emphasis in original). As seen in *Heien,* a mistake of law arising from a statute that is ambiguous or open to competing interpretations is reasonable and can be the basis for justifying a vehicle stop. *Id*. at 540. Here, it cannot be said that the officers' mistake was reasonable. The relevant Municipal Code plainly defines a parked vehicle as one that is unoccupied. *See e.g., Guinto v. Nestorowicz,* 2015 WL 3421456, at*2 (N.D. Ill. May 28, 2015) ("A reasonable officer in Nestorowicz's position would have known that Guinto was not illegally *parked*. The municipal code defines parking as 'the standing of an *unoccupied* vehicle.'") (emphasis in original). Accordingly, reasonable suspicion did not exist to stop Thompkins solely for violating the head lamp ordinance because the officers' mistake of law was not a reasonable one.

### B. Turn signal violation

The government next argues that Thompkins' failure to signal when reentering the flow of traffic provided the officers with justification to stop Thompkins. MCC § 9-40-200(c) requires that "[a] turn signal shall be given to indicate an intention to change lanes or start from a parallel parked position." For his part, Thompkins reiterates his position regarding the head lamp violation, arguing that since he occupied his vehicle at all relevant times he could not have violated the ordinance. At first, a similar outcome may seem warranted, but a fair

Page 8 of 17

reading of the turn signal ordinance yields a different result. In fact, § 9-40-200(c), though referencing a vehicle in a "parked position" necessarily implies that the vehicle be occupied. Suggesting otherwise would render the ordinance illogical and completely meaningless by somehow suggesting that a vehicle must be unoccupied while initiating its turn signal to start from its parked position. And in interpreting a statute, Courts must give statutes their plain meaning and not render them nonsensical. *United States v. Vance,* 764 F.3d 667, 676 (7th Cir. 2014) (quoting *United States v. Brown,* 333 U.S. 18, 27 (1948)) ("'No rule of construction necessitates our acceptance of an interpretation resulting in patently absurd consequences.'"). Accordingly, there was no mistake of law on the part of the officers. Moreover, officers that have probable cause to issue citations can do so without eliminating all possible defenses or exceptions that may be later sorted out through the judicial process. *United States v. Johnson,* 874 F.3d 571, 573 (7th Cir. 2017) ("Officers who had probable cause … were entitled to approach the car before resolving statutory exceptions. Police possessed of probable cause can hand out tickets (or make arrests) and leave to the judicial process the question whether a defense, exception, proviso, or other limitation applies."); *see also United States v. Lewis,* 920 F.3d 483, 489 (7th Cir. 2019) ("The officer is not the judge. Whether the driver actually committed a traffic infraction is irrelevant for Fourth Amendment purposes so long as there was an objective basis for a reasonable belief he did."). Officer Farias testified that he observed Thompkins pull away from the curb to reenter the flow of traffic without

engaging his turn signal. (Hearing Tr. at 36:10-15). This observation, standing alone, provided the officers with the requisite reasonable suspicion to stop Thompkins.

Thompkins also argues that the warrantless stop should be deemed invalid under the police-created exigency doctrine. Thompkins suggests that exigent circumstances created as a result of police conduct cannot lead to a valid search and seizure under the Fourth Amendment. However, even where officers are found to have contributed to the exigent circumstances, a subsequent search is still valid if the officers' actions leading up to the search were reasonable. *Kentucky v. King,* 563 U.S. 452, 462 (2011) ("Where, as here, the police did not create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment, warrantless entry to prevent the destruction of evidence is reasonable and thus allowed.").

Thompkins posits that by driving the incorrect direction on a one-way street that the officers created the exigency which lead to the warrantless seizure. A review of the dash camera footage belies this claim. As seen in Government Exhibit 1, Thompkins pulls his vehicle to the side of the street at 00:13, while the officers are still approximately one-half block away and on the other side of the intersection. At that time, the officers had stopped to inspect another vehicle with their flash light. The officers then continued up May Street, at a normal rate of speed, crossing the intersection at approximately the 00:22 mark of the dash camera footage and then eventually passing Thompkins at 00:37. The officers did not stop Thompkins until they turned around and engaged their emergency lights at the 01:01 mark. *See* Gov.

Exh. 1. At the time Thompkins pulled his vehicle to the side of the street, the officers were more than twenty seconds away and on the other side of the intersection. None of the officers' actions created exigent circumstances requiring Thompkins to pull over. The officers were down across the street at the time that Thompkins pulled over and did not pass him until he was already pulled over.

Further, even if it can be said that the police created exigent circumstances forcing Thompkins to pull to the side, the turn signal infraction did not occur until after the officers passed Thompkins' vehicle and any alleged exigent circumstances had dissipated. The police-created exigency doctrine applies only when officers engaged in unreasonable conduct, such as "where the police, without a warrant or any legally sound basis for a warrantless entry, threaten that they will enter without permission unless admitted." *King,* 563 U.S. at 462 n.4. The circumstances here did not present Thompkins with such a decision. Finally, this argument is undercut by Thompkins' own words. The most likely reason for Thompkins pulling to the side was that he was at his final destination. During Officer Farias' initial questioning of Thompkins, Thompkins tells Officer Farias that he is "going right here" while pointing to the property just behind the officer. Gov. Exh. 2. at 00:45-01:17. Simply, the police-created exigency doctrine is inapplicable to the facts here. The officers did not act unreasonably or engage in conduct that violated the Fourth Amendment. *See King* 563 U.S. at 462. Even if the doctrine was applicable, the hypothetical exigency no longer existed at the point when the officers witnessed Thompkins violate the turn

signal ordinance and cannot be said to be the contributing factor to Thompkins violating the ordinance.

### C. Obstructed view violation

Finally, the government argues the officers had a reasonable basis to believe Thompkins violated MCC § 9-40-250(b) which states "[n]o person shall drive any motor vehicle upon a roadway with any object so placed in or upon the vehicle as to obstruct the driver's clear view through the windshield, except required or permitted equipment of the vehicle." On direct examination, Officer Farias testified that he noticed "objects in the mirror" that "may be obstructing the view of the driver." (Hearing Tr. at 36:3-6). Similarly, Broderick noticed "a large air freshener and a phone holder blocking the center windshield." (*Id.* at 108:13-18). This testimony is further corroborated by the dash camera footage that was captured as the officers passed Thompkins vehicle. Gov. Exh. 1. at 00:30-00:35. Having observed this violation, the officers no doubt had a reasonable basis to stop Thompkins. *Whren,* 517 U.S. at 810. On cross-examination and in his supplemental brief, Thompkins attempted to highlight apparent inconsistencies regarding precisely when the officers noticed the obstructed view, what objects they saw, and what was written in their reports. This approach needlessly concentrates solely on the subjective beliefs and intentions of the officers. The appropriate inquiry merely asks whether a reasonable officer, presented with the same scenario, could have stopped the car. *Id.* at 813. Here, the testimony and video footage establish that not only did Officers Farias and Broderick have reasonable suspicion to stop Thompkins, but that this belief was also

objectively reasonable. *See United States v. Garcia-Garcia,* 633 F.3d 608, 614 (7th Cir. 2011) (upholding a stop of a vehicle where the sole reason for stopping the vehicle was the officer's belief that an air freshener was hanging from the rearview mirror); *see also United States v. Smith,* 80 F.3d 215, 219 (7th Cir. 1996) ("In the instant case, the sole reason for the stop was the presence of an air freshener hanging from the rear view mirror. This reason is, nevertheless, sufficient because Fourth Amendment analysis is objective.").

**II. The stop of Thompkins was not unreasonably prolonged**

Thompkins next argues that the officers unreasonably prolonged the duration of the traffic stop in violation of the Fourth Amendment. "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop … and attend to related safety concerns." *Rodriguez v. United States,* 135 S. Ct. 1609, 1614 (2015). The safety of police officers is inherently related to the mission of the stop itself which necessarily permits certain negligible intrusions into a driver's personal liberty in the interest of officer safety. *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977) ("[W]e are asked to weigh the intrusion into the driver's personal liberty occasioned … by the order to get out of the car. We think this additional intrusion can only be described as *de minimis*. What is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety."); *see also United States v. Tinnie,* 629 F.3d 749, 751 (7th Cir. 2011) ("During a valid traffic stop, an officer may order the driver and passengers out of the vehicle without violating the Fourth Amendment.").

### A. Ordering Thompkins out of his vehicle was lawful and related to the mission of the stop

First, Officer Farias' order to have Thompkins step out of the vehicle was reasonably related to the mission of the traffic stop for purposes of ensuring officer safety. A review of the body camera footage demonstrates that Officer Farias' safety concerns were not a last-minute concoction to extend the bounds of the search, but instead were evident at the outset of his interaction with Thompkins. Indeed, the second question that Officer Farias asked Thompkins, mere seconds after the stop commenced, was whether there were any guns in the vehicle. Gov. Exh. 2. at 00:20-00:55. When he returned to his police vehicle, Officer Farias learned that Thompkins had several weapons related convictions. (Hearing Tr. at 42:4-20). Officer Farias then asked Thompkins about his prior convictions, to which Officer Farias noticed Thompkins become defensive and evasive of the subject. (*Id.* at 43:9-17). Additionally, Officer Farias observed that Thompkins was sitting awkwardly in his seat. (*Id.* at 43:18-44:2). Just seconds after Officer Farias questioned Thompkins about his prior convictions, Officer Broderick noticed a baton near the center console of Thompkins' vehicle. (*Id.* at 44:8-24). Learning this only heightened Officer Farias's concern for his own and his partner's safety. (*Id.* at 44:25-45:4). Officer Farias proceeded to order Thompkins out of the vehicle to make sure Thompkins did not have any guns in the car. Gov. Exh. 2. at 5:22-5:31. At the time he gave this instruction, Officer Farias also told Thompkins he would not be giving him any tickets in an effort to deescalate the situation, but in fact had not yet decided whether he would issue any tickets. (Hearing Tr. at 46:3-7).

As always, the analysis turns on the reasonableness of the seizure. Here, merely asking a couple additional investigatory questions did not amount to an unreasonable inconvenience especially considering they were reasonably related to the safety mission of the stop. *United States v. Walton,* 827 F.3d 682, 688 (7th Cir. 2016). Further, the order to have Thompkins leave his vehicle was reasonably related to the interest of officer safety—an interest that is intertwined with the mission of the traffic stop. *Rodriguez,* 135 S. Ct. at 1616; *see also Mimms,* 434 U.S. at 111. At the time that Officer Farias ordered Thompkins out of the vehicle, Officer Farias had noticed Thompkins sitting suspiciously, in that his seat was moved far forward towards the steering wheel which seemed odd for a larger man, Officer Farias was aware of several prior gun related convictions, and Officer Broderick had observed a the baton which can be used as a weapon within arms reach of Thompkins. Asking Thompkins out of his vehicle amounts to a "negligibly burdensome precaution[] in order to complete [the officers'] mission safely." *Rodriguez,* 135 S. Ct. at 1616.

### B. The officers had independent reasonable suspicion to continue the stop

Even assuming, as Thompkins argues, the lawful purpose of the stop ended at the moment Officer Farias informed Thompkins that he would not be issuing any tickets, the officers possessed independent reasonable suspicion to extend the stop. To extend the traffic stop and further detain Thompkins, the officers must have independent reasonable suspicion apart from the initial justification for the stop. *Lewis,* 920 F.3d at 492-93. Here, several factors contribute to an objectively reasonable basis to extend the stop and consequently remove Thompkins from the car

including Thompkins' nervous behavior, Thompkins sitting awkwardly to conceal the lower half of his body, his several prior gun convictions, his evasive answers upon being questioned regarding those convictions, the presence of a baton within reach of Thompkins, Thompkins seeming surprise that there was a baton there, and finally his escalation of anger demanding that a supervisor appear on the scene. (Hearing Tr. 40:3-22, 42:4-20, 43:9-44:2, 44:15-45:4, 112:8-113:3). Nervousness, criminal histories, and suspicious answers can all raise reasonable suspicion. *Lewis,* 920 F.3d at 493. Taken in isolation, Thompkins' nervous behavior and criminal history could not alone provide officers with reasonable suspicion. *See United States v. Johnson,* 427 F.3d 1053, 1057 (7th Cir. 2005) ("And although a law enforcement officer's knowledge of a suspect's criminal history may support the existence of reasonable suspicion, such knowledge in itself is not enough."). Rather than over analyze each individual factor to determine whether reasonable suspicion can stand on each independently, the Court considers the totality of the circumstances in assessing reasonable suspicion. *Navarette,* 572 U.S. at 397. In doing so, the Court finds there was an objective basis for reasonable belief that Thompkins was engaged in criminal activity and therefore the extension of the stop was lawful.

Finally, to the extent that the traffic stop was extended at all, it was extended due to the Thompkins own refusal to comply with the officer's direction to get out of the car until a supervisor appeared on the scene. Even with that demand, the officers on the scene were able to obtain the presence of a supervisor within minutes of the stop to explain why he needed to leave the car. There was no unreasonable extension

of time caused by the officers to create probable cause. The officers had observed a violation, could arrest upon the violation, and could protect themselves from harm during that arrest.

## **CONCLUSION**

For the reasons stated above, Thompkins' Motion to Suppress is denied.

*[signature]*
_____
Virginia M. Kendall
United States District Judge

Date: May 31, 2019